John GOLDSBERRY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 40A05–0404–CR–204.

Court of Appeals of Indiana.

Jan. 28, 2005.

---

Sarah L. Nagy, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ryan D. Johanningsmeier, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

John Goldsberry appeals his convictions of and sentences for criminal recklessness, a Class D felony,[1] and battery, a Class A misdemeanor.[2] He raises several issues on appeal, which we consolidate and restate as:

1. Whether the trial court erred when it admitted evidence of prior physical altercations between Goldsberry and the victim and of phone calls Goldsberry made to the victim in the months after the crimes in question;

2. Whether Goldsberry's convictions violate his right under the Indiana Constitution to be free from double jeopardy;

---

1. Ind.Code § 35–42–2–2.

2. Ind.Code § 35–42–2–1.

3. Whether Goldsberry's sentences violate his Sixth Amendment right to trial by jury pursuant to *Blakely v. Washington*, 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), *reh'g denied* —— U.S. ——, 125 S.Ct. 21, 159 L.Ed.2d 851 (2004); and

4. Whether the trial court erred when it prohibited Goldsberry from possessing or owning a firearm.

We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY[3]

Goldsberry met Kristi Wilkerson in the winter of 2001, and they began dating in February 2002. Shortly thereafter, they began living together at Wilkerson's house, maintaining the household together and sharing expenses. Because of physical altercations, they broke up six or seven times during 2002, but they always got back together when Goldsberry apologized and promised to change.

On January 31, 2003, the couple spent the day working around Wilkerson's house and then went out to dinner. Goldsberry had been drinking all day and had consumed twelve beers by the end of dinner. Wilkerson began drinking at dinner and had three or four beers. Because Goldsberry was drunk, Wilkerson drove them back to her house. On the way, Wilkerson stopped the truck and got out to take off her coat. She put her coat in the toolbox in the bed of her truck, and as she was shutting the toolbox lid, she smashed her thumb. Goldsberry began taunting Wilkerson about the pain she was experiencing in her thumb.

Soon thereafter, Goldsberry reached under the driver's seat, grabbed Wilkerson's .38 caliber revolver that was in a case, took it out of the case, and announced, "You're not going to shoot me, bitch." (Tr. at 173.) Wilkerson told him she had no intention of shooting him and asked him to put the gun away. Instead, Goldsberry kept it in his hand and said again, "I'm not letting you shoot me." (*Id.* at 174.) When they arrived at Wilkerson's house and exited the truck, Wilkerson asked Goldsberry to leave the gun in the truck. Goldsberry threw the case in the truck and said, "There's your damn gun." (*Id.* at 176.) Wilkerson thought Goldsberry had thrown the gun back into the truck.

After they entered the house, Goldsberry pushed Wilkerson and would not let her go through the doorway from the living room to the kitchen. He pushed her into a gas space heater and then, when she got up, he pushed her back onto the bed.[4] While pushing her, Goldsberry said, "You're not going any where [sic] bitch." (*Id.* at 184.) Then, he laid on top of Wilkerson so she could not get up from the bed, and he kept telling her she was not going to get away from him.

After five minutes, Goldsberry got up to get a beer. He told Wilkerson to stay on the bed. Wilkerson got up to go to the restroom and told Goldsberry where she was going. As she walked toward the restroom, Goldsberry approached her and began shoving her on the chest and shoulder until she fell down. When she got up, he pushed her into the gas stove, the counter, and a ceramic crock pot. He then pushed her into the bathroom and she fell into the bathtub, ripping down the shower

---

**3.** We held oral argument in this case at Elkhart Central High School. We thank the high school for its warm reception and counsel for their presentation and their willingness to travel north for the argument.

**4.** To reduce heating costs during the winter, Wilkerson moved her bed to the living room and closed off the bedroom.

curtain, bending the curtain rod, and hitting the ceramic soap dish. He again told her "you're not going any where [sic] bitch." (*Id.* at 196.) Wilkerson was in pain but was afraid to get up, so she stayed in the bathtub.

After five minutes, Goldsberry returned to help Wilkerson out of the bathtub. Wilkerson walked toward the bedroom to lie down. Before she got there, Goldsberry grabbed her by the hair and said "You're not going anywhere, bitch." (*Id.* at 199.) He pulled the .38 caliber handgun out from behind his back, put it to her head, and said "You think I'm going to kill you now." (*Id.* at 201.) Wilkerson begged him to stop. Instead, Goldsberry glared at her, shot the gun next to her right ear, put the hot barrel next to her head so she could feel the heat, and said "You think I won't kill you now." (*Id.*) Goldsberry then pushed her onto the bed and stayed on top of her for a number of minutes.

Eventually, Goldsberry got up and again told Wilkerson to stay on the bed. He went back to the kitchen to drink more beer. Then, as he was urinating on the kitchen floor, he asked Wilkerson if she wanted "the privilege of holding it." (*Id.* at 205.) He went back to the living room, sat close to her, tapped the gun on his knee, and again told her she was not going anywhere. Wilkerson was unable to call the police because Goldsberry was watching her and, when she tried to use the phone, he broke it. Goldsberry packed a bag for himself and then ordered Wilkerson to drive him to his truck, which was half a mile away at a cabin on Wilkerson's property. On the way out of Wilkerson's house to her truck, Goldsberry threw the gun into her lawn.

Wilkerson drove Goldsberry to the cabin, where he entered a second truck and drove away. Wilkerson drove back to her house, retrieved the gun from the lawn, went into the house, and cried herself to sleep. When she woke, she called a friend to take her to the hospital. She also called the police, who met her at the emergency room. Police photographed large bruises and swelling on Wilkerson's right inner thigh, right knee, forearms, back and shoulder.

The State charged Goldsberry with confinement, a Class B felony;[5] criminal recklessness, a Class D felony; battery, a Class A misdemeanor; domestic battery, a Class A misdemeanor;[6] and criminal mischief, a Class B misdemeanor.[7] A jury found Goldsberry guilty of criminal recklessness and battery, and the trial court entered convictions on those two counts. The court sentenced Goldsberry to serve three years, with six months suspended to probation, for criminal recklessness. That sentence was to be served consecutive to one year, with one year suspended, for battery.

## DISCUSSION

1. *Admission of Evidence*

 Goldsberry argues the court erred in admitting evidence of physical altercations between him and Wilkerson occurring before the crimes charged and of phone calls he made to Wilkerson in the months following the crimes. The admission of evidence is within the sound discretion of the trial court, and the decision

---

5. Ind.Code § 35–42–3–3(a)(1)(2).

6. Ind.Code § 35–42–2–1.3.

7. Ind.Code § 35–43–1–2. The State also charged Goldsberry with carjacking, a Class

D felony, Ind.Code § 35–42–5–2, and auto theft, a Class D felony, Ind.Code § 35–43–4–2.5(b). However, the State dismissed those charges prior to trial.

whether to admit evidence will not be reversed absent a showing of manifest abuse of discretion by the trial court resulting in the denial of a fair trial. *Williams v. State,* 782 N.E.2d 1039, 1045 (Ind.Ct.App. 2003), *trans. denied* 792 N.E.2d 43 (Ind. 2003). A decision is an abuse of discretion if it is clearly against the logic and effect of the facts and circumstances before the court. *Id.* In reviewing the decision, we consider the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

### A. Prior Physical Altercations

During direct examination of Wilkerson, the following dialogue occurred:

Q How would you characterize this relationship that you had with [Goldsberry]? Was it all smooth sailing?

A No. Very turbulent.

Q Did the two of you argue occasionally?

A Yes.

Q How often would you estimate that you two argued?

A Several times, once every couple of weeks or three and get into it.

Q Okay, did the two of you ever have any physical altercations?

A Oh yes.

Q And let me back you up a little bit, in January of last year, how long would it have been that you two had been living together?

A Just shy of a year.

Q In that year, how many physical altercations would you guess,

[Defense]: Objection.

[Court]: [Defense], the basis for your objection?

[Defense]: Well, I think that, I don't think it has any relevance to whether or not these crimes, these alleged crimes occurred on the date in question. I think these prior acts are not relevant.

[Court]: [Prosecutor]?

[Prosecutor]: Well, I think the door is open and we will find that this was a self-defense. Although we're just going to be talking generally at this point about the relationship, I think it's admissible even under 404 B to rebut that and to discuss the relationship. Your Honor, also,

[Court]: The objection is overruled at this time. You may continue.

Q Approximately, actually, I kind of forgot my questions, Ms. Wilkerson, but I think it was.

[Court]: How many physical altercations had occurred in the eleven months or so they were together.

Q Yeah, how many times did the two of you get in a physical altercation?

A At least four big ones.

Q Were there others that weren't big ones?

A Ones that were not reported of a smaller magnitude.

Q And this is before January, right, of last year?

A Yes.

(Tr. at 163–65.)

Later in her testimony, the State asked Wilkerson whether January 31, 2003 was "the first time that you had been physically attacked by the Defendant." (*Id.* at 223.) Over the objection of defense counsel and after a hearing outside the presence of the jury, the court permitted Wilkerson to testify in detail regarding attacks on August 2, 2003, and Thanksgiving of 2003. (*Id.* at 229–39.)

■ "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Ind. Evidence Rule 404(b). In assessing the admissibility of 404(b) evidence, a trial court must undertake a two-step analysis. It must: (1) determine the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect. *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind.2002).

■ The well-established rationale behind Evid. R. 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997). The list of "other purposes" in the Rule is not exhaustive; extrinsic act evidence may be admitted for any purpose not specified in Rule 404(b) unless precluded by the first sentence of Rule 404(b) or any other Rule. *Id.*

■ The second step of a 404(b) analysis is to balance the probative value of the evidence against its prejudicial effect. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Evid. R. 403. "The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission." *Evans v. State*, 727 N.E.2d 1072, 1079 (Ind.2000).

At trial, the State argued the evidence was admissible under 404(b) because:

[T]he Defendant's intent has been placed at issue by the Defendant's opening statement and probably in voir dire. But, the opening statement said that this was an act of self defense and that Kristi Wilkerson was the initial aggressor. This evidence is offered to rebut that. Also, with respect to the recklessness charge, the[y] argued accident and it's also offered to rebut that.

(Tr. at 224–25.) The court determined:

With regard to the prior acts between Mr. Goldsberry and the victim, because the Defendant has indicated that he A) acted in self defense and or B) the discharge of the firearm was an accident, the Court is going to permit that evidence into the record.

(*Id.* at 228.)

■ On appeal, Goldsberry argues we should find the trial court erred when it admitted the evidence, citing *Wickizer v. State*, 626 N.E.2d 795, 799 (Ind.1993). In *Wickizer*, our supreme court held the intent exception to Rule 404(b) should be narrowly construed so that the exception does not swallow the rule. *Id.* Accordingly, the intent exception is available only "when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent." *Id.* If the defendant alleges a contrary intent in opening statement, cross-examination of a State's witness, or presentation of his own case, the State may then offer evidence of prior crimes or acts "to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense," if the probative value outweighs the prejudicial effect. *Id.* Applying that rule, our supreme court reversed Wickizer's convictions because he had not presented a "particularly contrary intent" prior to the State

introducing evidence of prior bad acts and because the evidence prejudiced Wickizer. *Id.* at 800.

Goldsberry alleges he, like Wickizer, did not present a contrary intent. We disagree. During his opening argument, Goldsberry claimed he was acting in self-defense and pushed Wilkerson to keep her away from the handgun. (Tr. at 135–36) ("[H]e will also testify that she'd made threats to kill him, to shoot him with the gun previously.... He wasn't about to let her have this gun because of the threat she had made before.... [S]he was hysterical, trying to get the gun [and] he pushed her away in the kitchen....").

That opening argument makes the facts of this case similar to *Evans*, 727 N.E.2d at 1080. There, Evans "went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent—self defense." *Id.* The evidence the State sought to admit was "that [Evans] recently fought with and choked [his ex-girlfriend] after she insisted on ending their relationship." *Id.* Our supreme court held that evidence "directly rebutted [Evans]'s claim that [the murder victim] was the dangerous aggressor and tended to show [Evans] initiated their fatal fight after he saw [the murder victim] in bed with [his ex-girlfriend]." *Id.*

■ In addition, evidence of prior physical altercations between parties is admissible to prove lack of mistake or accident. In *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind.Ct.App.2004), we noted: "Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." Accordingly, Iqbal's prior assault of the murder victim was relevant to show the nature of their relationship and "his hostility towards her," *id.* and therefore was highly relevant to show "his motive to shoot her," *id.*, and "absence of mistake." *Id.*

Goldsberry tries to distinguish *Iqbal* based on the fact that Iqbal had used a gun against his victim in prior assaults, while Goldsberry had never used a gun against Wilkerson in previous assaults. However, Goldsberry does not explain why the evidence of his prior assaults against Wilkerson would not have been admissible to demonstrate his motive was to batter her and not simply to defend himself. As the evidence had a purpose other than to demonstrate Goldsberry's propensity to commit the crime, it was admissible under the first step of the 404(B) analysis.

■ Regarding the balancing required under Rule 403 to determine whether the probative value of the evidence outweighs the prejudicial effect, the State claims the "evidence was highly probative." (Appellee's Br. at 13.) We agree, in light of Goldsberry's claim that he was acting in self-defense. Furthermore, given the amount of physical evidence these crimes occurred, including the photos of bruising on Wilkerson's body and the broken objects police found in Wilkerson's home, the prejudice to Goldsberry could not have been greater than the probative value. Accordingly, the trial court did not abuse its discretion when it admitted this evidence. *See Evans*, 727 N.E.2d at 1080.

#### B. *Phone Calls*

■ In May, approximately three months after the crimes occurred, Wilkerson began receiving voice mail messages from Goldsberry. Between May 21st and the early part of June, Goldsberry left twelve messages in which he said hello, asked for forgiveness, expressed his love for her, and/or asked her to call him back.

Over Goldsberry's objection, the court permitted the jury to hear those messages.

On September 3, 2003, approximately seven months after the crimes occurred, Goldsberry left three messages on Wilkerson's voice mail. In the first, recorded at 8:59 p.m., Goldsberry said:

Kristi Wilkerson, (inaudible) Indiana was your boyfriend living with you. My truck wasn't at the cabin. You need to be honest with me. I'm sorry about the consequences didn't happen to you. You're such a liar and you're a fucking two-timer and death is upon you.

(Tr. at 294.) The second was left one hour later in Goldsberry's voice:

Did you request for jail or (inaudible) or dye his hair blonde or did you do it al [sic] all? I cannot believe you, how you lied to me. I cannot believe how you lied to me. This mother fucker has been there all along and dyed his hair blonde. Did he try to be me? That mother fucker can't (inaudible). What's up with you? I'm going to find out. Where in the hell is my truck? Did you sell my truck? I hope you didn't. Please don't let me find out you sold my truck. I hope to God you didn't do that. If you did, I'm sorry about it. I don't know what's going to happen. I don't think you did. I think you just lied. I just don't, I just can't, what is your deal old girl? I honestly just don't know what your deal is. You're not being honest with me at all. Hey, just like (inaudible) and dyed his hair blonde. It just really fucked me up. I know you're there. I just drove by your house and I know you're there and I drove by earlier and I seen [sic] Bill sticking out the back door (inaudible) went by and his fucking dyed blonde hair. I went up to the cabin and him [sic] and Robert came up there. I was there.

(*Id.* at 294–95.) Later that night, Goldsberry left the following message:

I'm crazy, god damn crazy. (inaudible) What's up with that? He said he loved me and all this fucking bullshit. He ain't nothing (inaudible). What the hell's up with you? God damn liar. I want to get my fucking truck and I tell you what old girl, I better not find out who's got my fucking truck. And I tell you another fucking thing, you better never close your eyes at night start and I'll be standing there when you wake up mother fucker.

(*Id.* at 295.) The trial court admitted those messages over Goldsberry's objection because Goldsberry intended to offer evidence of Wilkerson's behavior after February 1st and "if we're going to open the door after February 1, it's going to be all the way open." (*Id.* at 227.)

Goldsberry claims: (1) the evidence was not relevant, as required by Evid. Rule 401; and (2) the probative value of the evidence was outweighed by its prejudicial effect, making the evidence inadmissible under Evid. Rule 403. Under Evid. R. 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 403 provides relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

We, like Goldsberry, fail to see the relevance of the phone messages left for Wilkerson in May and June. Nothing in those messages appears helpful to a jury's decision about whether Goldsberry committed battery and criminal recklessness on the night of January 31, 2003. Accordingly,

that evidence was inadmissible under Evid. R. 401. *See, e.g., Wilson v. State,* 770 N.E.2d 799, 802 (Ind.2002) (trial court erred in admitting evidence when "the photograph did not make more or less probable any issue before the jury").

Nevertheless, errors in the admission of evidence may be disregarded as harmless "unless the errors affect the substantial rights of the party." *Id.* To determine whether Goldsberry's substantial rights were violated, we consider "the probable impact of that evidence upon the jury." *Id.* Because the phone messages Goldsberry left in May and June were fairly benign, we fail to see how their admission could have prejudiced Goldsberry in light of the physical evidence the battery occurred. *See, e.g., id.* Accordingly, we need not reverse Goldsberry's convictions due to the admission of those phone calls. *See id.*

As for the three phone calls in September, the State argues the multiple threats to harm Wilkerson that Goldsberry made in those telephone messages were relevant to demonstrate (1) Goldsberry had not been acting in self-defense when he battered Wilkerson and (2) the shooting was not an accident.

Assuming *arguendo* the threats in those phone calls were relevant to prove Goldsberry's intent on the night in question, we question the necessity of their admission. Our supreme court has warned:

> In its effort to prove guilt, the State may not "flood the courtroom" with unnecessary and prejudicial details of prior criminal conduct merely because some of that evidence is relevant and admissible. Rule 404(b) is on the books because evidence of prior crimes is presumptively prejudicial. Even where a prior criminal act is relevant to a material fact, the potential for unfair prejudice dictates

> that the evidence of the prior misconduct be limited to that necessary to prove the disputed fact.

*Thompson v. State,* 690 N.E.2d 224, 236 (Ind.1997) (quoting *United States v. Smith,* 80 F.3d 1188, 1193 (7th Cir.1996)).

We believe it was unnecessary for the State to present the prior acts *and* the phone messages containing threats in order to effectively rebut Goldsberry's claim he acted in self-defense. Nevertheless, in light of Wilkerson's testimony, the number of significant injuries Wilkerson sustained and the damage to her property found by police, Goldsberry cannot demonstrate sufficient prejudice from the admission of this evidence for us to reverse his convictions. *Cf. id.* (reversing defendant's convictions because "an impermissible flood of damaging propensity evidence washed away [defendant's] right to a fair trial").

### 2. *Double Jeopardy*

Goldsberry argues his convictions of both battery and criminal recklessness violate his right under the Indiana Constitution to be free from double jeopardy. Article 1, section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." We review *de novo* whether a defendant's convictions violate this provision. *Spears v. State,* 735 N.E.2d 1161, 1166 (Ind.2000), *reh'g denied.*

In *Richardson v. State,* 717 N.E.2d 32 (Ind.1999), our supreme court outlined the test for whether two convictions violate Indiana's double jeopardy provision. That test has two parts. *Davis v. State,* 770 N.E.2d 319, 323 (Ind.2002), *reh'g denied.* First, we evaluate whether the statutory elements of the crimes are the same. *Id.* Then, we evaluate whether the actual evidence used to convict the defendant of the two crimes is the same. *Id.*

The statutory elements analysis is the same as the test enunciated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Martin v. State*, 740 N.E.2d 137, 140 (Ind. Ct.App.2000), *trans. denied* 753 N.E.2d 13 (Ind.2001). To determine whether two offenses are the same under the "statutory elements" test, we review "whether each statutory provision 'requires proof of an additional fact which the other does not.' " *Id.* at 139–140 (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180). When we compare the elements of the crimes, each crime must contain at least one element that is separate and distinct from the other crime. *Richardson*, 717 N.E.2d at 52.

The elements of battery as a Class A misdemeanor are: (1) knowingly or intentionally; (2) touching; (3) another person; (4) in a rude, insolent, or angry manner; (5) resulting in bodily injury to any other person. Ind.Code § 35–42–2–1(a). The elements of criminal recklessness as a Class D felony are: (1) recklessly, knowingly, or intentionally; (2) performing; (3) an act; (4) that creates a substantial risk of bodily injury to another person; (5) while armed with a deadly weapon. Ind. Code § 35–42–2–2.

> Looking only to the statutory elements of these offenses, it is clear that each statute requires proof of an additional fact which the other does not. Battery requires proof of a knowing or intentional rude, insolent, or angry touching; it does not require proof of a substantial risk of bodily injury. Criminal recklessness requires proof of a reckless, knowing, or intentional act that creates a substantial risk of bodily injury; it does not require proof of a touching. Therefore, we find no double jeopardy violation in [defendant's] convictions for both battery and criminal recklessness.

*Rodriguez v. State*, 714 N.E.2d 667, 669–70 (Ind.Ct.App.1999), *trans. denied* 726 N.E.2d 303 (Ind.1999). Goldsberry's convictions do not violate the statutory elements test. *See id.*

Nevertheless, Goldsberry claims "[i]t is quite likely that the jurors relied upon the same facts to find conduct for the battery as it did for the criminal recklessness." (Appellant's Br. at 15.) Under the "actual evidence" test, we must examine the evidence presented at trial to determine "whether each challenged offense was established by separate and distinct facts." *Bruce v. State*, 749 N.E.2d 587, 590 (Ind.Ct.App.2001) (quoting *Richardson*, 717 N.E.2d at 53), *trans. denied* 761 N.E.2d 414 (Ind.2001). To demonstrate two offenses are the same, the appellant must show a reasonable possibility that the facts used by the jury to establish the essential elements of one offense were also used to establish the essential elements of the second offense. *Id.* The appellant must show more than a remote or speculative possibility that the same facts were used. *Id.* To determine what facts were used, we consider the evidence, charging information, final jury instructions, and arguments of counsel. *Davis*, 770 N.E.2d at 324; *Bruce*, 749 N.E.2d at 590.

The charging information for criminal recklessness alleged:

> On or about the 1st day of February, 2003, in Jennings County, State of Indiana, JOHN E. GOLDSBERRY did recklessly, knowingly or intentionally perform an act, to-wit: discharging a .38 revolver firearm next to Kristi Wilkerson's head, that create[d] a substantial risk of bodily injury to Kristi Wilkerson.

(Appellant's App. at 87.) The charging information for battery alleged:

> On or about the 1st day of February, 2003, in Jennings County, State of

Indiana, JOHN E GOLDSBERRY did knowingly or intentionally touch another person, to-wit: Kristi Wilkerson, in a rude, insolent or angry manner, resulting in serious bodily injury, to-wit: bruises, redness and scratches on Kristi Wilkerson's back, left and right forearms, right inner thigh, right knee, right buttocks, and right shoulder area.

(*Id.* at 89.)

The final jury instructions set out the following elements for criminal recklessness as a Class D felony:

1. The Defendant
2. recklessly, knowingly, or intentionally
3. performed an act that created a substantial risk of bodily injury to Kristi Wilkerson, and
4. Defendant performed the act while armed with a deadly weapon.

(*Id.* at 34.) The elements of battery as a Class A misdemeanor, as provided in the final jury instructions were:

1. The Defendant
2. knowingly or intentionally
3. touched Kristi Wilkerson
4. in a rude, insolent, or angry manner
5. which resulted in bodily injury to Kristi Wilkerson.

(*Id.* at 35.)

The State made the following comments during final argument regarding whether it had proved the required elements of criminal recklessness and battery:

> ... I need to talk to you about the elements.... As far as the criminal recklessness count, the gun, as you'll be instructed, is a deadly weapon. It was discharged next to her head. Doctor Khaoiat told you that that creates a substantial risk of injury to a person when a gun's fired off next to their head. Not to mention, you don't know where a bullet's liable to ricochet if you're firing a gun in the house. No one was shot, but we were lucky. That bullet could've ended up any where[sic]. As far as the battery and domestic battery, basically, the elements require us to prove a rude, insolent, and angry touching and that touching causes injury. You will see back in the jury room when you review the evidence you will see all the pictures of Kristi's injuries. You've heard the Doctor testify about it. You've heard Kristi testify about it and you've heard Sergeant Jones testify about all the injuries he observed....

(Tr. at 416–18.)

The charging information, final instructions and final argument by the State all suggest the jury would not have relied on the same facts to convict Goldsberry of both battery and criminal recklessness. Accordingly, his argument fails.

### 3. *Right to Jury for Sentencing*

Goldsberry claims his sentences violate his Sixth Amendment right to trial by jury pursuant to *Blakely,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403. Prior to *Blakely* we reviewed our trial courts' sentencing decisions for an abuse of discretion. *See, e.g., Bocko v. State,* 769 N.E.2d 658, 667 (Ind.Ct.App.2002), *reh'g denied, trans. denied* 783 N.E.2d 702 (Ind.2002). If a trial court used aggravating or mitigating circumstances to modify the presumptive sentence, all we required the trial court to do was: (1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance is determined to be mitigating or aggravating; and (3) articulate the court's evaluation and balancing of the circumstances. *See id.*

In *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held: "Other

than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Based on that holding, the *Blakely* Court held the Sixth Amendment requires a jury to determine beyond a reasonable doubt the existence of aggravating factors used to increase a sentence above the presumptive sentence assigned by the legislature.[8] 124 S.Ct. at 2536. An exception to that rule is the fact of a prior conviction. *Id.*

■ The State argues Goldsberry waived his Sixth Amendment argument by failing to raise it at sentencing. Recently, a panel of this court held that a defendant did not waive his *Blakely* argument by failing to present it at trial because a defendant must knowingly and intelligently waive his right to trial by jury, which the defendant could not have done prior to knowing he had such a right. *Strong v. State*, 817 N.E.2d 256, 260–61 (Ind.Ct.App. 2004). We see no reason to stray from that holding here.

### A. *Criminal Recklessness*

■ The trial court ordered Goldsberry to serve three years, with six months

suspended, for Criminal Recklessness as a Class D felony. The presumptive sentence for a Class D felony is eighteen months, and the statute permits eighteen months to be added for aggravating factors. Ind. Code § 35–50–2–7. Therefore, Goldsberry was given the maximum possible sentence under Indiana law.

The trial court relied on Goldsberry's criminal history, which included nine misdemeanor convictions and one felony conviction, to increase his sentence to greater than the presumptive. Under *Blakely*, a trial court can rely on prior convictions as an aggravator without a finding by a jury. —— U.S. at ——, 124 S.Ct. at 2536. Goldsberry's prior convictions included: three misdemeanor convictions for driving under the influence, one felony conviction for driving under the influence, and one misdemeanor conviction for violating a protective order. In addition, Goldsberry was adjudicated an habitual traffic violator and lost his license.[9] Given the number of convictions in Goldsberry's criminal history and the fact the court can find criminal history as an aggravator without the assistance of a jury, the trial court did not violate *Blakely* when it sentenced Goldsberry to more than the presumptive for criminal recklessness.

---

8. The State argues at great length that Indiana's sentencing scheme does not run afoul of *Blakely*. Essentially, the State claims the range of possible sentences for each class of felonies under Indiana law is the same as the "standard range" of sentences under Washington law. (Appellee's Br. at 20.) Accordingly, the State believes Indiana law does not contain "exceptional" sentences that are longer than the "standard range." It argues the "presumptive sentence" is a "guidepost" that does not fit the *Blakely* definition of a "statutory maximum." (*Id.* at 21.) We disagree.

In *Blakely*, the Court explained the "statutory maximum" penalty "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose

without any additional findings." *Blakely*, 124 S.Ct. at 2537. "When a judge inflicts punishment that the jury's verdict standing alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' ... and the judge exceeds his proper authority." *Id.* Because trial courts must announce aggravators to sentence a defendant to greater than the presumptive sentence, Indiana's presumptive sentence amounts to *Blakely's* statutory maximum. *See Holden v. State*, 815 N.E.2d 1049, 1059 n. 6 (Ind.Ct.App.2004).

9. The identity of the other misdemeanor convictions is unclear from the record before us, as the appendix does not contain the presentence investigation report.

### B. *Battery*

The trial court ordered Goldsberry to serve a one-year sentence for battery as a Class A misdemeanor. Ind.Code § 35–50–3–2 provides: "A person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one (1) year; in addition, he may be fined not more than five thousand dollars ($5,000)." Goldsberry claims that sentence "exceed[s] the presumptive sentence established by the Legislature," (Appellant's Br. at 15), but he has not explained why one year is not within the presumptive sentence range assigned by the legislature for *Blakely* purposes. As the trial court can impose a one-year sentence for a Class A misdemeanor without any additional findings, *Blakely* is not implicated.

### C. *Consecutive Sentences*

After discussing *Blakely*, Goldsberry simply states, without explanation or citation to authority: "the sentences should be ordered to be served concurrently." (*Id.* at 18.) The State argues at great length that *Blakely* deals only with the length of sentence for a specific crime and that it does not have implications for the trial court's ability to order sentences served consecutively. *See Blakely*, — U.S. at —, 124 S.Ct. at 2536 (The Sixth Amendment prohibits a trial court from finding facts "that increase[ ] the penalty *for a crime* beyond the prescribed statutory maximum") (emphasis added). The State also notes that numerous jurisdictions have held *Blakely* does not apply to consecutive sentencing decisions. (*See* Appellee's Br. at 25–26.) We agree with the State. Recently, a panel of this court held *Blakely* does not apply to a trial court's decision to order sentences to be served consecutively, *Cowens v. State*, 817 N.E.2d 255, 255 (Ind.Ct.App.2004), and we reaffirm that holding here.

### 4. *Possession of a Firearm*

Finally, Goldsberry claims the trial court erred when it prohibited him from possessing or owning a firearm at any point in the future because the jury did not find him guilty of domestic battery.[10] Goldsberry is correct when he asserts the jury acquitted him of domestic battery. (Appellant's App. at 23.) However, the trial court's prohibition was not based on a conviction of domestic battery.

The Appendix contains an order entitled "DOMESTIC VIOLENCE DETERMINATION" signed by Judge Webster and file-stamped on February 3, 2004. That order provides:

> The Court, in accordance with I.C. 35–38–1–7.7, having heard evidence at trial, or based on a factual basis provided as part of a guilty plea in this case now

---

**10.** Ind.Code § 35–42–2–1.3 defines domestic battery:

> (a) A person who knowingly or intentionally touches an individual who:
> (1) is or was a spouse of the other person;
> (2) is or was living as if a spouse of the other person as provided in subsection (b); or
> (3) has a child in common with the other person;
> in a rude, insolent, or angry manner that results in bodily injury to the person described in subdivision (1), (2), or (3) commits domestic battery, a Class A misdemeanor.

If a person has been convicted of domestic battery, he "may not possess or carry a handgun in any vehicle or on or about [his] body in [his] dwelling or on [his] property or fixed place of business." Ind.Code § 35–47–2–1(b). Unless the right has been restored, "[a] person who has been convicted of domestic battery under IC 35–42–2–1.3 and who knowingly or intentionally possesses a firearm commits unlawful possession of a firearm by a domestic batterer, a Class A misdemeanor." Ind.Code § 35–47–4–6.

finds that the Defendant has committed a crime of domestic violence, as defined by I.C. 35–41–1–6.3. The Defendant has been advised that upon conviction: he/ she shall lose the right to possess a firearm, possession of a firearm or ammunition may constitute a separate crime, parenting time with minor children may be restricted, and other·legal penalties may be applicable and should be discussed with his/her attorney.

"Crime of domestic violence," as defined by I.C. 35–41–1–6.3 means an offense or the attempt to commit an offense that:

 (1) has as an element the:

 (A) use of physical force; or

 (B) threatened use of a deadly weapon; and

 (2) is committed against a:

 (A) current or former spouse, parent, or guardian of the defendant;

 (B) person with whom the defendant shared a child in common;

 (C) person who was cohabiting with or had cohabited with the defendant as a spouse, parent, or guardian; or

 (D) person who was or had been similarly situated to a spouse, parent, or guardian of the defendant.

The Defendant was represented by counsel or made a valid waiver of counsel. The Defendant was advised of his/ her right to a jury trial and either received a jury trial or knowingly waived that right.

(Appellant's App. at 11.)

Ind.Code § 35–38–1–7.7 provides:

(a) At the time of sentencing, a court shall determine whether a person has committed a crime of domestic violence (as defined in IC 35–41–1–6.3).

(b) A determination under subsection (a) must be based upon:

 (1) evidence introduced at trial; or

 (2) a factual basis provided as part of a guilty plea.

(c) Upon determining that· a defendant has committed a crime of domestic violence, a court shall advise the defendant of the consequences of this finding.

(d) A judge shall record a determination that· a defendant has committed a crime of domestic violence on a form prepared by the division of state court administration.

That statute does not explain what the "consequences of the finding" are. The consequences are found in Ind.Code § 3–7–13–5 and § 33–28–4–8.

Section 3–7–13–5 provides in pertinent part:

(b) Notwithstanding IC 35–47–2, IC 35–47–2.5, or the restoration of the right to vote under this section and except as provided in subsections (c), (d), and (g), a person who has been convicted of a crime of domestic violence (as defined in IC 35–41–1–6.3) may not possess a firearm upon the person's release from imprisonment or lawful detention.

Section 33–28–4–8 provides in pertinent part:

(g) Notwithstanding IC 35–47–2, IC 35–47–2.5, or the restoration of the right to serve on a jury under this section and except as provided in subsections (c), (d), and (l), a person who has been convicted of a crime of domestic violence (as defined in IC 35–41–1–6.3) may not possess a firearm:

 (1) after the person is no longer under a sentence imposed for an offense; or

 (2) after the person has had the person's rights restored following a conviction.

Those statutes give the trial court authority to prohibit a person who commits an act of "domestic violence" from possessing a

gun in the future. However, we have concern about the application of those statutes to Goldsberry.

Ind.Code § 35–38–1–7.7, subsection (b) of Ind.Code § 3–7–13–5, and subsection (g) of Ind.Code § 33–28–4–8 were all added to the Indiana Code pursuant to Public Law 195—2003.[11] The additions and modifications in P.L. 195—2003 had an effective date of July 1, 2003. Goldsberry committed battery and criminal recklessness against Wilkerson on or about January 31, 2003, *prior to* the effective date of those statutes.

 Both the United States Constitution and the Indiana Constitution prohibit *ex post facto* laws. *See* U.S. Const. Art. I, § 10, Ind. Const. Art. I, § 24. The analysis for whether a statute violates the *ex post facto* provisions is the same under the federal and state constitutions. *See Spencer v. O'Connor,* 707 N.E.2d 1039, 1042 (Ind.Ct.App.1999), *trans. denied* 726 N.E.2d 305 (Ind.1999). The *ex post facto* clauses prohibit Indiana from enacting a law that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Id.* (quoting *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)). Our focus is not on whether the legislative change causes a "disadvantage." *Id.* Rather, we must determine whether the change "increases the penalty by which a crime is punishable" or "alters the definition of criminal conduct." *Id.* (quoting *Cal. Dep't of Corrections v. Morales,* 514 U.S. 499,

506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)).

Ind.Code § 35–38–1–7.7, which the trial court used to prohibit Goldsberry from owning or possessing a firearm at any time in the future, became effective after Goldsberry committed the crimes cited by the court as the reason he may no longer possess or own a firearm. Accordingly, we must determine whether Ind.Code § 35–38–1–7.7 "increases the penalty by which a crime is punishable" or "imposes additional punishment to that then prescribed" when Goldsberry battered Wilkerson and committed criminal recklessness. In *Spencer,* we explained:

Our courts have not previously established a clear test to determine what constitutes punishment under the Ex Post Facto Clause. Nor has the Supreme Court articulated a formula for identifying legislation that falls within constitutional *ex post facto* prohibition. *See Morales,* 514 U.S. at 505, 115 S.Ct. at 1603, 131 L.Ed.2d at 603. However, we note that, in *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Supreme Court used the same test under the Double Jeopardy and Ex Post Facto Clauses, leading us to conclude that the test for punishment is the same for both clauses. Recently, in *State v. Hurst,* 688 N.E.2d 402 (Ind.1997), our supreme court discussed punishment in the context of the Double Jeopardy Clause.

\* \* \* \* \*

... Adopting the "intents-effects" test articulated in the Supreme Court's *Hen-*

---

**11.** Section seven of Public Law 195—2003 added to the Code as a new section Ind.Code § 35–47–4–6, which criminalizes possession of a handgun by a person convicted of domestic battery. However, section 8 of P.L. 195—2003 provides: "IC 35–47–4–6, as added by this act, applies only to crimes committed after June 30, 2003." Accordingly, even if the jury had found Goldsberry guilty of domestic battery and the trial court's order had prohibited Goldsberry from possessing a firearm pursuant to Ind.Code § 35–47–2–1(b), Goldsberry could not have been convicted of possession of a firearm by a domestic batterer under Ind.Code § 35–47–4–6.

*dricks* opinion and in *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), our supreme court stated that determining whether a sanction is punishment is a two-step process. First, we must determine whether the legislature intended the proceedings to be civil or criminal. In making this determination, we may examine the declared purpose of the legislature as well as the structure and design of the statute. *Ursery*, 518 U.S. at 279, 116 S.Ct. at 2147, 135 L.Ed.2d at 561. If the intent was civil, we must next ask whether the "statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Hurst*, 688 N.E.2d at 404. The second part of the test requires the party challenging the statute to provide "the clearest proof" of the punitive purpose or effect of the statute. *Id.* Thus, in determining whether a sanction is civil or criminal, we cannot look solely to the label given to it by the legislature, but must also examine whether it is so punitive in effect as to no longer be properly called a civil sanction. *Id.*

*Spencer*, 707 N.E.2d at 1042–43.

In Indiana, statutes are passed without recorded legislative history by which we may determine the legislature's intent when it passed Ind.Code § 35–38–1–7.7. *See id.* at 1043. Therefore, we look first to the Act. *Id.* In this case, P.L. 195—2003

provides that it is "an act to amend the Indiana Code concerning criminal law and procedure." That statement leads us to believe the legislature intended the proceeding to determine whether the defendant had committed an act of domestic violence to be a criminal proceeding and the denial of the right to own a firearm to be a punishment for committing an act of domestic violence.

Nevertheless, we also look at where in the Code the legislature placed the laws in the Act. The two statutes that prohibit possession of a firearm by persons who have committed an act of domestic violence are located in civil portions of the Indiana Code.[12] However, Section 35–38–1–7.7, which directs the trial court to determine whether a defendant committed a crime of domestic violence, is located in the criminal code.

As the Act explicitly indicates it is to amend the criminal code and the legislature placed in Title 35 the statute ordering the trial court to make a finding of domestic violence upon sentencing, we believe the legislature intended the sanction to be a criminal punishment.[13] *Cf. Spencer*, 707 N.E.2d at 1043 (holding legislature's intent was civil where Act had no stated purpose and Act added only civil code sections). Therefore, application of Ind.Code § 35–38–1–7.7 to Goldsberry violates the *ex post facto* clauses of the federal and state constitutions,[14] and we must reverse the trial

**12.** Section 33–28–4–8 deals with the "Qualifications of Jurors." It is located in Title 33, which contains laws regarding "Courts and Court Officers," Article 28, which is entitled "Circuit Courts," and Chapter 4, which is entitled "Jury Commissioners and Jury Service."

Section 3–7–13–5 contains law regarding "Disfranchisement of prisoners; restoration of voting rights." Title 3 contains "Elections" laws, Article 7 of that Title contains "Voter Registration" laws, and Chapter 13

contains "Registration and Voting Requirements" laws.

**13.** As the intent was criminal, we need not address the second step of the "intents-effect" test, which is whether the effect is criminal. *Cf. Spencer*, 707 N.E.2d at 1043.

**14.** Because we reverse the trial court's order based on violation of the *ex post facto* clauses, we need not determine whether the trial court is finding without the participation of the jury, that Goldsberry committed an act of

court's order finding Goldsberry committed an act of domestic violence.[15]

## CONCLUSION

The trial court's admission of the prior acts was not erroneous and the admission of the phone calls was harmless error. Goldsberry's right to be free from double jeopardy was not violated by his convictions of both criminal recklessness and battery. Goldsberry's sentences do not violate the Sixth Amendment as explained in *Blakely*. However, the trial court's order finding Goldsberry committed an act of domestic violence, which finding would indefinitely prohibit Goldsberry from owning a firearm, violates Goldsberry's right to be free from *ex post facto* laws and must be reversed.

Affirmed in part and reversed in part.

BARNES, J., and CRONE, J., concur.

domestic violence violates the Sixth Amendment pursuant to *Blakely*.

**15.** We explicitly note our holding does not impact the court's ability to prohibit Goldsberry from possessing a firearm while he is on probation. The court's authority to enter such a restriction comes from Ind.Code § 35–38–2–2.3(a)(8), which existed prior to Goldsberry's commission of the crimes in question.