**Emmanuel McCLENDON,**
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0811–CR–999.

Court of Appeals of Indiana.

Aug. 10, 2009.

Transfer Denied Oct. 1, 2009.

David Pardo, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Emmanuel McClendon appeals his conviction of and sentence for murder.[1] We hold there was no error in the admission of evidence, the evidence was sufficient, the

---

1. Ind.Code § 35–42–1–1.

bailiff's communication with the prosecutors was harmless, and his sentence is appropriate. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

McClendon was charged with the murder of eight-year-old K.H. K.H.'s parents are Christopher and Laura H., who were separated at the time of K.H.'s death. Christopher was residing in his grandmother's house on White Avenue in Indianapolis. On the evening of February 8, 2008, Laura brought eight-year-old K.H. and six-year-old A.H. to the house on White Avenue to spend the night with Christopher. K.H. and A.H. got out of Laura's car, which was parked on the street, and started playing in Christopher's truck, which was parked in the driveway. Laura remained in the car, and Christopher tried to persuade her to stay the night.

While they were talking, McClendon drove past them. White Avenue is a one-block residential street running between Burdsal Parkway on the north and 23rd Street on the south, and therefore would not generally be a convenient route to take. McClendon lived nearby on 23rd Street, and Christopher had known McClendon since they were young. They had been friends, but they had a falling out and were not in contact with each other. It was unusual for McClendon to be on White Avenue, and Christopher commented on it to Laura. Christopher said he put his hand on his waist when McClendon drove by, and Laura testified that Christopher pulled a gun out of his pocket and placed it on the ledge of her car window.

After McClendon passed by, Christopher, Laura, and the two girls drove to Red Lobster to pick up some food. On the way home, Laura and the girls were sleeping. Christopher was driving, and while he was on Burdsal Parkway, he saw McClendon turning right onto Burdsal from either White Avenue or an alley that runs behind the houses on White Avenue. McClendon then made a right turn onto the next street, taking him back south.

When they arrived back at Christopher's residence, Christopher and Laura woke up the girls, and they all went inside. K.H. immediately lay down on the couch, and the other three went into the bedroom. Before long, Christopher and Laura heard a car in the alley behind the house. Christopher suspected it was McClendon's car because he had an old car with a distinctive sound.

Christopher grabbed his gun and ran outside, but he did not see anything. He came back inside and headed back to the bedroom. After he had been inside for a few seconds, shots rang out. Christopher, Laura, and A.H. ran into the living room.

K.H. had been shot. Christopher said he saw her sitting on the floor near a bookcase, and he picked her up, fired two shots out the window, and handed K.H. to Laura. Laura recalled first seeing K.H. laying face down on the floor near the door.

K.H. was shot through the head and would have survived, if at all, for only a few minutes. The bullet passed through completely, and the specific bullet that caused the injury could not be identified. The entrance wound was irregular in shape, which is consistent with the bullet passing through another object before hitting K.H.

Three spent bullets were recovered from inside the house. Eleven spent casings were found grouped around a tree to the southwest of the residence. They were Golden Tiger brand 7.62 × 39 casings that could be fired from an AK–47.

There were four bullet holes in the picture window on the west side of the house. Mark Ahonen of the Indiana State Police Laboratory testified two of the holes were from inward bound bullets and two were from outward bound bullets. One of the inward shots and the two outward shots were through the same pane, and Ahonen was able to determine that the inward shot was fired before the two outward shots.

Ten bullet holes were discovered in the south side of the house, and the glass had been smashed out of a door. Some bullets also hit Christopher's truck. Michael Smilko, supervisor of the Crime Scene Unit of the Indianapolis–Marion County Forensic Service Agency, used trajectory rods to determine where the shooter had been located. Although he could not pin down an exact location, Smilko was able to determine the shots had been fired from an area southwest of the residence, near the tree where the casings were found.

McClendon's car and residence were searched. Nothing was found in the car. In the residence, police found several weapons, some spent 7.62 × 39 casings, and a variety of live ammunition, including Golden Tiger brand 7.62 × 39 cartridges. The spent casings found at McClendon's residence and the spent casings found at the crime scene were fired from the same gun.

The following stipulation was entered into evidence:

1. That on February 8, 2008, Defendant owned an Egyptian Maadi AK–47 rifle;

2. That the Egyptian Maadi AK–47 rifle uses 7.62 × 39 caliber ammunition;

3. That State's Exhibit 107 is a copy of the receipt for Defendant's purchase of said rifle.

(State's Ex. 106.) McClendon's AK–47 was never located.

McClendon testified at trial, attempting to establish self-defense. He testified that around 9:00 p.m., he left home to go to Church's Chicken to get something to eat. As he was driving on Burdsal Parkway, he saw a friend trying to flag him down. He turned onto White Avenue to turn around and get back to his friend. When he passed Christopher's house, Christopher was outside and pulled out a gun. McClendon stopped and fired two shots from his AK–47 without aiming. He then drove off, continuing to fire shots. McClendon claimed the gun fell out of his car while he was driving. McClendon testified he first drove to a hotel near Southport Road and Interstate 65. He threw away some casings, then went inside to rent a room, but decided the hotel was too expensive. He ended up at a cousin's house, where he heard on the news that K.H. had been killed.

McClendon made a series of concessions on cross-examination:

Q You admit that you fired that gun, that AK–47 through the front window of the house on White Avenue, correct?

A Yes.

Q You admit that you fired that gun into the truck parked in front of White Avenue that day, correct?

A Yes.

Q And you admit that you fired repeatedly through the side of the house with that AK–47?

A Yes.

Q You killed [K.H.] with your AK–47 that . . . night, didn't you?

A Yes.

(*Id.* at 580.)

In anticipation of McClendon's testimony regarding self-defense, the State was

permitted to present evidence of a confrontation between McClendon and Christopher as evidence of a contrary intent. Christopher testified William Francis had grown up in the same neighborhood as he and McClendon. Early in 2007, Francis was living next door to McClendon. Christopher and Francis were working together to find and sell scrap metal. For a period of about two weeks, whenever Christopher was with Francis, Christopher would get calls from a restricted number. The caller would not say anything. Finally, Christopher told the caller, "Whoever this is, you're a bitch and your momma's a bitch," and he hung up. (*Id.* at 539.) He immediately got another call, and he recognized McClendon's voice saying, "You's a bitch, you's a bitch, you don't want none, you's a bitch." (*Id.*)

On March 2, 2007, Francis and Christopher were in Francis' yard sorting scrap metal, when McClendon approached and said, "What's up now? What's up now?" in an angry voice. (*Id.* at 536.) Christopher asked what his problem was, and McClendon said, "You act like I don't know what you on, I know what you on, I swear you don't want none of 'em.... I see you trying to feel me out, I saw you trying bring—we saw—you looking at me trying to bring weed in the crib." (*Id.*) Christopher told McClendon he did not know what he was talking about, and McClendon pulled out a gun. McClendon kept saying, "You don't want none." (*Id.* at 537.) Christopher testified, "Where I come from, that is a direct threat." (*Id.* at 541.) Francis stepped in between them. Christopher left and made a report to the police. McClendon claimed to not remember this incident.

Attempting to discredit Christopher, McClendon called Francis as a witness. Regarding the March 2 confrontation, Francis testified he thought it seemed like Christopher and McClendon had a problem between them. Francis said McClendon was holding a weapon but did not make any threats.

Francis also testified that McClendon's garage had been shot at a few weeks before K.H. was killed. Francis said Christopher had called him and told him he had shot at McClendon's garage. Francis thought Christopher seemed "elated that he had done it ... like ... a weight had been lifted off him. He was basically telling me that he was tired of hiding from this person and going through the rigmarole that they was going through, so he retaliated." (*Id.* at 621.)

Christopher claimed Francis told him he had shot at McClendon's garage. McClendon claimed he did not suspect any particular person of committing the shooting.

At the close of the evidence, the trial court discussed on record the fact that the bailiff had e-mailed the prosecuting attorneys about a question from the jury. The court found the bailiff's action was improper but harmless, and both parties agreed that no corrective action was needed.

The jury found McClendon guilty of murder. At the sentencing hearing, Laura testified A.H. told one of her school counselors that she is scared and thinks she will die. Laura and Christopher both testified A.H. talks about wanting to kill the man who shot K.H. The trial court found McClendon's lack of criminal history mitigating. As aggravating factors, the trial court noted the nature and circumstances of the crime and the age of the victim. The trial court sentenced McClendon to sixty-five years.

## DISCUSSION AND DECISION

McClendon raises five issues, which we restate as: (1) whether the trial court abused its discretion by admitting evidence

of the March 2, 2007 confrontation; (2) whether the trial court committed fundamental error by not declaring a mistrial after learning about an e-mail communication between the bailiff and the prosecuting attorneys; (3) whether there was sufficient evidence he killed K.H. knowingly; (4) whether the trial court erred by denying his motion for a directed verdict; and (5) whether his sentence is inappropriate.

### 1. *Admission of Evidence*

■ McClendon argues the evidence of the March 2 confrontation was inadmissible pursuant to Ind. Evidence Rules 403 and 404(b). The admission of evidence is within the sound discretion of the trial court, and we will reverse only on a showing of abuse of discretion. *Goldsberry v. State*, 821 N.E.2d 447, 453–54 (Ind.Ct.App. 2005). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* at 454.

■ Evid. R. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

In assessing the admissibility of 404(b) evidence, the trial court must: (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect. *Goldsberry*, 821 N.E.2d at 455. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Evid. R. 403.

■ During voir dire, opening statements, and in his case-in-chief, McClendon raised the issue of self-defense.[2] The State argued the March 2 confrontation was admissible to show a contrary intent. In *Wickizer v. State*, our Indiana Supreme Court held the intent exception to Evid. R. 404(b) should be narrowly construed:

The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense.

626 N.E.2d 795, 799 (Ind.1993).

McClendon compares his case to *Gillespie v. State*, 832 N.E.2d 1112 (Ind.Ct.App. 2005), where we held certain 404(b) evidence was not admissible to rebut Gillespie's claim of self-defense. Gillespie was convicted of aggravated battery and criminal recklessness for stabbing Meckem. The State presented evidence that on the night of the stabbing, Gillespie had been drinking and using alcohol, was angry, and had threatened other people. The State argued this evidence was admissible to

---

**2.** Voir dire and opening statements were not included in the transcript; however, it is apparent from sidebar conversations that McClendon raised the issue of self-defense in voir dire and his opening statement. (*See* Tr. at 472–73, 476.)

show Gillespie's "state of mind." *Id.* at 1117.

We disagreed, noting "the only statutory element of self-defense to which Gillespie's 'state of mind' might be relevant is his 'reasonable belief' *vel non* that he is being subjected to the imminent use of unlawful force and his 'reasonable belief' vel non that his own use of force is necessary to prevent serious injury to himself." *Id.* Gillespie's anger, substance abuse, and threats to other people were not relevant to those issues. *Id.*

In McClendon's case, the 404(b) evidence was not offered to generally show his state of mind on the night of the offense. Nor did the evidence concern threats to people unconnected to the offense for which he was on trial. The State's evidence tended to show that McClendon harbored hostility toward Christopher and therefore is relevant to a shooting at Christopher's residence. This sort of evidence has often been found admissible. *See Goldsberry,* 821 N.E.2d at 456 (evidence of hostile relationship admissible to rebut claim of self-defense); *see also Evans v. State,* 727 N.E.2d 1072, 1080 (Ind.2000).

Nevertheless, McClendon argues the evidence should have been excluded because: (1) the confrontation occurred eleven months before the shooting; and (2) Christopher mentioned "weed" in his testimony, which could lead the jury to believe McClendon was involved in drug dealing. The record reflects the trial court carefully weighed these issues.

Just before jury selection, the trial court heard arguments on the admissibility of this evidence. Defense counsel told the court McClendon would be testifying, they would not dispute that he was the shooter, and they would advance the defense of self-defense. The trial court initially ruled that it would not permit evidence of the March 2 confrontation in the State's case-in-chief, but might allow it on rebuttal.

Defense counsel brought up the issue of self-defense in voir dire and in his opening statement. During cross-examination of Christopher, defense counsel mentioned a falling out between Christopher and McClendon. The State argued the door had been opened to evidence about the March 2 confrontation. The trial court excused the jury and heard Christopher's proffered testimony about the confrontation. The trial court expressed concern about the reference to "weed" in Christopher's proffered testimony and again ruled the testimony would not be permitted in the State's case-in-chief. (Tr. at 150.)

Near the end of its case-in-chief, the State asked the trial court to reconsider its ruling:

> The jury is left with a false impression from the opening statement, in his opening statement he alleged self-defense and then made the statement that he's not allowed to get into it, what really set this off and ... they're left with the impression some how that we're hiding the seminal event that started this all in motion.

(Tr. at 473.) The trial court agreed to review *Goldsberry* and revisit the issue after the State's final witness.

After the final witness, the trial court decided to allow the evidence:

> THE COURT: ... I am going to allow the State to recall in their case-in-chief, [Christopher] for the limited purpose of talking about a prior incident in March of 2007. And I'm doing that because I believe that in the opening statement and in jury selection, and in a lot of Mr. Thomas's [defense counsel] questions he's indicated—and quite honestly I fully anticipate that he will put forth the defense of self-defense in this case....

I've also carefully weighed the relevance, looked at the relevance issue and I do believe that the probative value, albeit, that it happened in March of '07, I think the probative value outweighs any prejudicial effect that it would have and that's why I'm also allowing that too.

＊ ＊ ＊ ＊ ＊ ＊

MS. McCOY [for the State]: And then with the March '07 incident I want to just be clear: [Christopher] talked about the threats that Mr. McClendon made while he had the gun in that incident, Mr. McClendon was talking about saying that he knew that Chris was watching him bring marijuana in the house.

＊ ＊ ＊ ＊ ＊ ＊

THE COURT: ... I'm telling you this is a very tricky issue ... but to me I listened to what he said when the State made their Offer to Prove, outside the presence of the jury, and it just doesn't make sense unless that comes in, so I'm going to allow that in.

(*Id.* at 528, 530–32.)

Intertwined with these arguments were discussions about the anticipated evidence that Christopher may have shot at McClendon's garage a few weeks before McClendon shot K.H. Although the March 2 confrontation was somewhat distant, the trial court concluded there was some evidence of an ongoing conflict between Christopher and McClendon. The trial court also explicitly considered the prejudicial effect of the reference to marijuana or "weed" and determined it provided context for the conflict. The reference to marijuana was contained in one sentence in the course of a three-day trial. The trial court has wide latitude in weighing the probative value of evidence against possible prejudice. *Goldsberry*, 821 N.E.2d at 455. The trial court thoroughly considered the issue, and we cannot say it abused its discretion.

2. *Bailiff's Communication to Prosecutors*

■ After the close of evidence, the following record was made:

THE COURT: ... I want to make a record of what we talked about, now that Mr. McClendon is present here. So I want to make that real quickly, and that is as follows: I received notice from the prosecuting attorneys that my bailiff had sent a quick e-mail to the State in this case indicating to them that the jury had questions about whether or not you had to continue to pull the trigger on the rifle to get it to fire and that they needed to bring that up, to the jury. And I first of all don't think that was a proper notice, I don't think my bailiff had any harm in doing that and it was prior to the State's ballistics witness testifying which in fact testified exactly on that. I will note that Mr. Thomas [3] also testified to that as well and I shared that with Mr. Thomas and Mr. Thomas did not believe there was any action that needed to be taken as a result of that e-mail. I do want to thank the State for bringing that to my attention though, I think that was exactly what you should have done. So anything else you need to add on that, Ms. McCoy?

MS. McCOY: No.

THE COURT: Mr. Thomas, do you agree that there's no action?

---

**3.** Mr. Thomas was McClendon's attorney and obviously did not testify. The State suggests

the trial court meant to refer to McClendon.

MR. THOMAS: I agree, Judge, and I have no problem.

(Tr. at 641–42.)

■ McClendon argues the trial should not have proceeded after the trial court learned that the bailiff had communicated with only the prosecutors about a question from the jury. Acknowledging he did not make an objection at trial or move for a mistrial, McClendon argues the error was fundamental.

> Fundamental error is error that represents a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. The error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. In determining whether a claimed error denies the defendant a fair trial, we consider whether the resulting harm or potential for harm is substantial.

*Davis v. State,* 835 N.E.2d 1102, 1107 (Ind. Ct.App.2005) (citations omitted), *trans. denied.*

We agree with the trial court that the bailiff's action was improper, but not prejudicial. The State was already planning to call a ballistics expert, who surely would have testified in detail about the workings of an AK–47 whether or not the State was specifically aware of the jury's question. McClendon acknowledges his own testimony indicated he pulled the trigger repeatedly. (Appellant's Br. at 30.) Moreover, the fact of whether an AK–47 fires automatically or semi-automatically, while of interest to the jury, was at best an ancillary issue to McClendon's guilt. Therefore, we conclude a mistrial was not warranted. *See Wilson v. State,* 511 N.E.2d 1014, 1018 (Ind.1987) (bailiff's communication to jury not reversible error where the communication was harmless).

3. *Sufficiency of Evidence*

■ McClendon argues there was insufficient evidence he killed K.H. knowingly. *See* Ind.Code § 35–42–1–1 ("A person who ... knowingly or intentionally kills another human being ... commits murder, a felony."). In reviewing the sufficiency of evidence, we do not reweigh the evidence or assess the credibility of witnesses. *Bruno v. State,* 774 N.E.2d 880, 882 (Ind. 2002). We consider the evidence favorable to the verdict and the reasonable inferences to be drawn therefrom. *Id.* We will affirm if there is probative evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

McClendon argues there is insufficient evidence he knowingly killed K.H. because there was no evidence he was aware of the location of any individual within the house. *See Champlain v. State,* 681 N.E.2d 696, 702–03 (Ind.1997) (Champlain shot through door of trailer and killed a woman inside; evidence was sufficient to support conviction of murder because sound of victim's voice could have permitted Champlain to determine her location). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35–41–2–2(b).

McClendon's case is comparable to *Bruno.* Bruno and his cohorts shot into a residence where a fraternity party was under way, killing one person and injuring three others. Our Supreme Court found there was sufficient evidence to convict him of murder. *Bruno,* 774 N.E.2d at 882–83; *see also Jones v. State,* 689 N.E.2d 722 (Ind.1997) (sufficient evidence of murder where Jones fired into a home where fifteen to twenty people were socializing). McClendon argues *Bruno* and *Jones* are distinguishable because numer-

ous people were present in the homes, whereas there were only four people present in the residence McClendon fired on.

We disagree. The first time McClendon passed the house, all four family members were outside. He passed the house again while the family was on the way home from Red Lobster, and he passed by again soon after they arrived home. Two vehicles were parked in the driveway and the lights in the house were on. Thus, it is reasonable to infer he knew the family was inside. McClendon used an assault rifle to fire at least eleven shots at two sides of a house described as being so small it would fit easily within the courtroom where McClendon was tried. The bullets were so powerful that they penetrated the walls, furniture, and appliances and chipped a cast iron pan. Although there were fewer people inside the house than in *Jones* or *Bruno*, these facts demonstrate McClendon was aware of a high probability he would kill someone inside the residence.

### 4. *Directed Verdict*

▮▮▮▮ McClendon moved for a directed verdict at the close of the State's evidence. He argues the trial court erred by denying that motion because the State did not present evidence in its case-in-chief that he was the shooter.

In order for a trial court to appropriately grant a motion for a directed verdict, there must be a total lack of evidence regarding an essential element of the crime, or the evidence must be without conflict and susceptible only to an inference in favor of the innocence of the defendant. If the evidence is sufficient to sustain a conviction upon appeal, then a motion for a directed verdict is properly denied; thus, our standard of review is essentially the same as that upon a challenge to the sufficiency of the evidence. We neither reweigh evidence

nor judge witness credibility, but consider only the evidence that supports the conviction and the reasonable inferences to be drawn therefrom in order to determine whether there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt.

*Edwards v. State,* 862 N.E.2d 1254, 1262 (Ind.Ct.App.2007) (citations omitted), *trans. denied.*

The trial court properly denied McClendon's motion. There was evidence McClendon drove past the residence several times that evening, although White Street was an unusual route to take. McClendon stipulated he owned an AK–47, which uses 7.62 × 39 caliber ammunition. Spent 7.62 × 39 caliber casings at the crime scene matched other spent casings found at McClendon's residence. There was also evidence of a conflict between McClendon and Christopher. Moreover, McClendon argued self-defense in his opening statement, apparently conceding he had fired into the residence.

To the extent McClendon is arguing the bullet may have come from Christopher's gun, the State presented probative evidence to the contrary. Christopher and Laura testified Christopher fired his shots after K.H. was already dead. Christopher testified he fired two shots through the front window, and there were two outward bound bullet holes in the front window. At least one of the inward bound bullet holes was there before Christopher fired his shots. The shape of the entrance wound was irregular, suggesting the bullet had passed through another object—such as the exterior wall of the home or the window—before hitting K.H. Therefore, the trial court properly denied McClendon's motion for a directed verdict.

## 5. *Appropriateness of Sentence*

 McClendon argues his sixty-five year sentence is inappropriate. *See* Ind.Code § 35–50–2–3 (maximum sentence for murder is sixty-five years). We may revise a sentence if it is "inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). We give deference to the trial court, recognizing the special expertise of the trial court in making sentencing decisions. *Barber v. State*, 863 N.E.2d 1199, 1208 (Ind.Ct.App.2007), *trans. denied.* The defendant bears the burden of persuading us the sentence is inappropriate. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind.Ct.App.2007).

McClendon drove by the residence several times, waiting to strike until the family had settled in for the evening. *See Moore v. State*, 907 N.E.2d 179, 182 (Ind. Ct.App.2009) (affirming sentence where Moore carefully planned a robbery and lay in wait for the victim). He shot into the residence repeatedly with a powerful assault rifle. Given the power of the weapon, the number of shots, and the size of the house, it appears to be sheer luck that the other three occupants escaped unscathed. Whatever the nature of McClendon's dispute with Christopher, eight-year-old K.H. clearly was an innocent victim. *See* Ind. Code 35–38–1–7.1(a)(3) (trial court may consider as aggravating that victim of offense was less than 12); *Walker v. State*, 747 N.E.2d 536, 538 (Ind.2001) ("Crimes against children are particularly contemptible."). A.H., who was six years old at the time of the shooting, is another innocent victim. She has told her school counselor she is afraid she will die, and Laura and Christopher both testified that this young girl now talks about wanting to kill people.

 We acknowledge, as did the trial court, that McClendon has no criminal record. A lack of criminal history often is given significant mitigating weight. Maximum sentences are generally appropriate for the worst offenders; however, the class of offenders that warrant maximum punishment "encompasses a considerable variety of offenses and offenders." *Ritchie v. State*, 875 N.E.2d 706, 725 (Ind.2007) (quoting *Buchanan v. State*, 767 N.E.2d 967, 973 (Ind.2002)). "The principal role of appellate review should be to attempt to leaven the outliers, ... but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind.2008). Given the heinous nature of the offense, we cannot say McClendon's sentence is inappropriate.

Affirmed.

BAKER, C.J., and BARNES, J., concur.