**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHELLE F. KRAUS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

FILED
Nov 05 2012, 9:50 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

PATRICK FLUKER,                )
                              )
    Appellant-Defendant,        )
                              )
        vs.                )   No. 02A03-1203-CR-137
                              )
STATE OF INDIANA,              )
                              )
    Appellee-Plaintiff.          )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D06-1009-MR-10

**November 5, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Patrick Fluker ("Fluker") was convicted after a jury trial of murder,[1] a felony, enhanced due to the use of a firearm,[2] and receiving stolen auto parts[3] as a Class D felony. He appeals, raising the following restated issues:

I.     Whether the trial court abused its discretion when it admitted recorded statements made by Fluker to the police because he contends that they were made in violation of his *Miranda*[4] rights; and

II.    Whether the trial court abused its discretion when it admitted evidence taken from Fluker's pockets because he claims the evidence was seized after an illegal search.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Early on the morning of September 3, 2010, police received a 911 call reporting shots fired near the intersection of Broadway and Taylor Streets in Fort Wayne, Indiana. The caller reported that he heard two shots, followed by a pause, and then he heard an additional five or six shots. The caller lived near the parking lot for a General Electric plant, and when he went outside to investigate the sounds, he saw a dark-colored sedan parked in the empty lot. The caller then observed a black man wearing dark clothing, running from the tree line next to the parking lot, and getting into the car parked in the lot. The man attempted to exit the parking lot onto Taylor Street, but could not do so because of the fence around the parking lot. He then drove the car towards the gate to the

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 35-50-2-11.

[3] *See* Ind. Code § 35-43-4-2.5(c).

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

plant, where he exited the car and ran away on foot into a park next to the parking lot. The park was between the parking lot and Broadway Street. The caller lost sight of the man for a minute, but the man returned to the car, was inside for a minute or so, and then exited again. The man fled on foot through the park toward Broadway Street.

Fort Wayne Police Officer Benjamin MacDonald ("Officer MacDonald") heard the dispatch regarding the 911 call at approximately 4:19 a.m. and responded to the area. He was driving southbound on Broadway Street when he saw a man matching the caller's description walk out from behind the General Electric building near the park. The man, later identified as Fluker, began to walk northbound on Broadway Street. Because the nature of the 911 call dealt with shots fired and because Officer MacDonald was in a poor tactical position with regard to Fluker, the officer drove past Fluker, but kept sight of him in the rearview mirror. As soon as Officer MacDonald was able to turn out all the running lights on his car, he turned around to follow Fluker.

When Fluker passed under a bridge, Officer MacDonald briefly lost sight of him. When the officer emerged from under the bridge, he drove his car to an alleyway located up the embankment on the other side of the bridge. He then saw Fluker urinating on the side of the building. Officer MacDonald ordered Fluker to place his hands on the wall and placed him in handcuffs. The officer noticed that Fluker was sweating profusely. For his own safety, Officer MacDonald conducted a patdown search and found what he believed to be a knife in one of Fluker's pockets. When he pulled out the knife, he also located some papers, including a Walmart receipt, which he did not examine. Some of the papers contained the name Thomas Renier. Officer MacDonald asked Fluker whose

3

name was on the papers, and Fluker responded that he had found the papers under the bridge. Officer MacDonald returned the papers to Fluker's pocket, but kept the knife for safety reasons.

Fluker was placed into the back seat of Officer MacDonald's patrol car, which was equipped with a video and audio recorder. Officer MacDonald activated the recording equipment and read Fluker his *Miranda* rights. While Officer MacDonald was in the process of reading the *Miranda* warnings, immediately after Fluker had been warned that he had the right to remain silent, Fluker stated that he understood. Officer MacDonald suspected that Fluker had taken the papers in his pockets from the car that had been mentioned in the 911 call, so he drove to the General Electric parking lot. When they arrived at the parking lot, Fluker admitted that he had the keys to the car. He was wearing the key on a lanyard around his neck. Officer MacDonald used the keys to verify that they belonged to the car by opening the door and starting the car. The keys belonged to the car, which was a dark-colored four-door Cadillac that had been left in the General Electric parking lot.

Other officers responded to the area, including Fort Wayne Police Officer Keith Wallace ("Officer Wallace"). Officer Wallace confirmed through dispatch that the car, a 2000 Cadillac Seville, belonging to Thomas Renier, had been reported stolen. Fluker's belongings, including his high school diploma, were found inside of the car. Several items of women's clothing, including a shirt, skort, underwear, and flip flops, were also found in the backseat of the car. Officer Wallace spoke to the 911 caller, who pointed out the area where Fluker had originally parked the car and where he had observed Fluker

4

run out of the tree line. Officer Wallace then walked the area and found a woman's bra in the weeds. He continued into the woods and observed a puddle of blood and then a larger pool of blood that was "still bubbled" and contained "pink frothy tissue" in it. *Tr.* at 198. Officer Wallace went further and saw a foot and a leg; as he moved closer, he saw the whole body of a female, later identified as Tiffany Mendez ("Mendez"). She was completely nude and face down. When the officer checked for a pulse, he found none.

Fort Wayne Police Officer Michael Burris ("Officer Burris") returned to the location where Officer MacDonald had apprehended Fluker. In a search of the area, Officer Burris discovered a handgun and box of nine-millimeter ammunition on the roof of the building on which Fluker had been urinating. The handgun was swabbed for DNA and two profiles were recovered -- one for Mendez and one that could not exclude Fluker. Mendez had been shot between the eyes from a distance of more than eighteen inches. During the autopsy, Fluker's DNA was discovered on Mendez's body.

Police later learned that a day or two before the murder, Fluker had gone to Walmart with his cousin. One of the purchases that his cousin made that day was a box of nine-millimeter bullets she had purchased for her boyfriend. Fluker carried the bag containing the bullets to the car, and when his cousin returned home, she realized that the box of ammunition she had purchased was missing. Among the papers found in Fluker's pocket on the night of the murder was a receipt from Walmart from September 2, 2010 for the purchase of a box of ammunition.

The State charged Fluker with murder with an enhancement for using a firearm in the commission of the crime and receiving stolen auto parts as a Class D felony. On

5

August 9, 2011, Fluker filed a motion to suppress statements Fluker made to Officer MacDonald. A hearing was held, and the trial court denied the motion. A jury trial was conducted from February 7 through February 9, 2012. At the conclusion of the trial, the jury found Fluker guilty as charged. He was sentenced to fifty-five years for his murder conviction enhanced by five years for the use of a firearm and one-and-one-half years for his conviction for receiving stolen auto parts, to be served consecutively for an aggregate sentence of sixty-one-and-one-half years executed. Fluker now appeals.

## DISCUSSION AND DECISION

The admission of evidence is within the sound discretion of the trial court, and we will reverse only on a showing of abuse of discretion. *Boggs v. State*, 928 N.E.2d 855, 862 (Ind. Ct. App. 2010) (citing *McClendon v. State,* 910 N.E.2d 826, 832 (Ind. Ct. App. 2009), *trans. denied*), *trans. denied*. An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Taylor v. State,* 904 N.E.2d 259, 261–62 (Ind. Ct. App. 2009), *trans. denied.*

## I. Admission of Statements

Although Fluker phrases his argument as whether the trial court erred when it denied his motion to suppress, since he did not file an interlocutory appeal and this appeal follows a completed trial, the issue is more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Lanham v. State*, 937 N.E.2d 419, 421-22 (Ind. Ct. App. 2010). Fluker contends that the trial court abused its

6

discretion when it allowed the statements he made to Officer MacDonald to be admitted into evidence. Fluker specifically claims that these statements were made in violation of his *Miranda* rights because he did not make a knowing and voluntary waiver of his rights. He asserts that he did not indicate that he understood all of his rights and that there was no indication that he actually waived his rights.

We have held that when an accused is subjected to custodial interrogation, the State may not use statements stemming from the interrogation unless it demonstrates the use of procedural safeguards effective to secure the accused's privilege against self-incrimination. *Payne v. State*, 854 N.E.2d 7, 13 (Ind. Ct. App. 2006). The *Miranda* warnings apply only to custodial interrogation because they are meant to overcome the inherently coercive and police dominated atmosphere of custodial interrogation. *Id.* To be in custody for purposes of *Miranda,* the defendant need not be placed under formal arrest. *King v. State,* 844 N.E.2d 92, 96 (Ind. Ct. App. 2005). Rather, the custody determination turns upon whether the individual's freedom has been deprived in a significant way or if a reasonable person in his position would believe he is not free to leave. *Id.*

A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights. *Johnson v. State*, 829 N.E.2d 44, 50 (Ind. Ct. App. 2005) (citing *Ringo v. State,* 736 N.E.2d 1209, 1211–12 (Ind. 2000)), *trans. denied*. For a statement to be admissible, the State must show that a defendant's waiver was knowing and voluntary. *Id*. (citing *Deckard v. State,* 670 N.E.2d 1, 6 (Ind.

1996)). To determine whether a valid waiver was made, courts look to the totality of the circumstances. *Id.*

Here, Fluker was taken into custody after Officer MacDonald discovered him urinating on the exterior wall of a building. When Fluker was placed inside of Officer MacDonald's patrol car, the officer told Fluker that he was not under arrest but that he was in custody. Officer MacDonald then read Fluker his *Miranda* rights. During the reading of his *Miranda* rights, specifically after Fluker was told that he had the right to remain silent, Fluker responded by saying, "I understand, anything I say . . . ." *State's Ex*. 13. Officer MacDonald did not specifically ask Fluker if he understood the rest of his rights or if he wished to waive those rights.

After Officer MacDonald finished his reading of Fluker's rights, the following exchange took place:

| | |
|---|---|
| Officer: | Now like I said you're not under arrest right now, but this is what I think happened. You don't have to say anything. But, last time I dealt with people I stopped them when we get calls and they're running from cars and they got stuff in their pockets that look like it came straight out of a glove compartment, you know what that tells me? That I probably need to go look over at this car over here and looks like it probably got broken into. Right? |
| Fluker: | No. |
| Officer: | I'm not right? |
| Fluker: | No sir. Well, I'm gonna tell you what I did. Honest why I'm sweating. It's because I heard some gunshots and I started running. |

8

*Id.* By answering Officer MacDonald, Fluker demonstrated his desire to waive his right to remain silent, which was the specific right that he had explicitly acknowledged that he understood. Additionally, Fluker's statement that he understood his rights, even though it did not occur at the end of the reading of the rights, indicated his understanding of his rights. Under the totality of the circumstances, we conclude that the evidence showed that Fluker knowingly and voluntarily waived his *Miranda* rights.

Fluker's reliance on *Johnson v. State* is misplaced as that case is distinguishable from the present case. There, the detective read the defendant his rights, but failed to obtain a signature on the waiver form or inquire as to whether the defendant understood his rights. 829 N.E.2d at 50. The defendant also never expressed any understanding of his rights prior to making a statement regarding his involvement in the crime at issue. *Id.* The State in that case relied upon only the defendant's silence and the fact that he made a statement when faced with the evidence against him to show that the defendant had waived his rights. The present case is distinguishable because, here, Fluker expressed his understanding of his right to remain silent and then proceeded to break that silence by relaying his version of events. We therefore conclude that the trial court did not abuse its discretion in admitting the statements made by Fluker to Officer MacDonald.

## II. Admission of Evidence Found in Fluker's Pockets

Fluker argues that the trial court abused its discretion in allowing the papers found in his pockets to be admitted into evidence. He contends that this evidence was seized in

violation of the Fourth Amendment to the United States Constitution[5] because it was discovered as the result of an illegal search. He asserts that the papers were found when Officer MacDonald performed a patdown search for weapons; as the papers were clearly not weapons, Fluker argues that Officer Macdonald's removal of the papers exceeded the protective scope of the patdown search. He therefore alleges that the admission of the papers into evidence was an abuse of discretion.

The Fourth Amendment protects persons from unreasonable search and seizure, and this protection has been extended to the states through the Fourteenth Amendment. U.S. Const. amend. IV; *Boggs*, 928 N.E.2d at 863. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Id.* (citing *Halsema v. State*, 823 N.E.2d 668, 676 (Ind. 2005)). When a search or seizure is conducted without a warrant, the State bears the burden of proving that an exception to the warrant requirement existed at the time of the search or seizure. *Id.*

The United States Supreme Court established one such exception in *Terry v. Ohio,* 392 U.S. 1 (1968), which held that a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause, if, based on specific and articulable facts together with reasonable inferences from those facts, an ordinarily prudent person would reasonably suspect that criminal activity was afoot. *Howard v. State*, 862 N.E.2d 1208, 1210 (Ind. Ct. App. 2007). Reasonable suspicion is determined on a case-by-case basis by looking at the totality of the circumstances. *Id.* In addition to

---

[5] Fluker also mentions Article I, section 11 of the Indiana Constitution, but does not develop a separate argument under the Indiana Constitution. Therefore, any argument under the Indiana Constitution has been waived. Ind. Appellate Rule 46(A)(8)(a); *Smith v. State*, 822 N.E.2d 193, 203 (Ind. Ct. App. 2005), *trans. denied*.

detainment, *Terry* permits a police officer to conduct a limited search of the individual's outer clothing for weapons if the officer reasonably believes the individual is armed and dangerous. *Id.* The seizure of contraband detected during the lawful execution of a *Terry* search is permissible under the "plain feel doctrine." *Barfield v. State*, 776 N.E.2d 404, 407 (Ind. Ct. App. 2002). "If during the lawful patdown of 'the suspect's outer clothing,' the officer 'feels an object whose contour or mass makes its identity' as contraband 'immediately apparent' to that officer, a warrantless seizure may be executed." *Id.*

In the present case, Officer MacDonald was responding to a dispatch regarding shots being fired in the area and noticed Fluker, who matched the description of a man seen fleeing the area. When Officer MacDonald approached Fluker, Fluker was urinating on the side of a building. Due to the nature of the 911 call, Officer MacDonald decided to perform a patdown search of Fluker for officer safety to determine if Fluker had any weapons. During the patdown, Officer MacDonald discovered what he believed to be a knife. When he pulled out the knife, he also located some papers. Officer MacDonald noticed a person's name on some of the papers and asked Fluker about it; Fluker claimed that he had found the papers under the bridge. Officer MacDonald also noticed that one of the papers was a Walmart receipt, but did not examine it. The officer kept the knife for safety reasons, but returned all of the papers to Fluker's pocket.

Later, after it was determined that the car that Fluker had been driving was reported stolen and that there was a dead body in the park near where the car was located, Fluker was taken to the Detective's Bureau for questioning. Fort Wayne Police Officer Justin Holmes ("Officer Holmes") removed Fluker from Officer MacDonald's patrol car

11

and placed Fluker inside his own vehicle to transport Fluker for questioning. Before placing Fluker inside the vehicle, Officer Holmes conducted a search of Fluker. During this search, he discovered the papers that Officer MacDonald had seen earlier, a couple of condoms and a do-rag. Officer Holmes placed the items inside of a plastic bag and secured them in the front seat of his vehicle. He turned them over to a detective when he arrived at the Detective's Bureau.

"'So long as probable cause exists to make an arrest, the fact that a suspect was not formally placed under arrest at the time of the search incident thereto will not invalidate the search.'" *Sebastian v. State*, 726 N.E.2d 827, 830 (Ind. Ct. App. 2000) (quoting *Santana v. State,* 679 N.E.2d 1355, 1360 (Ind. Ct. App. 1997)), *trans. denied.* In addition, a police officer's subjective belief concerning whether he has probable cause to arrest a defendant has no legal effect. *Id.* (citing *Stevens v. State,* 701 N.E.2d 277, 280 (Ind. Ct. App. 1998). Probable cause to arrest exists where the officer has knowledge of facts and circumstances that would warrant a man of reasonable caution to believe that a suspect has committed the criminal act in question. *Id*. Under the search-incident-to-arrest exception to the warrant requirement, a police officer may conduct a search of the defendant's person and the area within his control. *Id*.

When Officer MacDonald approached Fluker, he observed Fluker urinating in public on the side of a building. Therefore, although Fluker was told he was not under arrest, Officer MacDonald had probable cause to arrest Fluker for public indecency at the time he conducted the patdown search and removed the papers from Fluker's pockets. Because probable cause existed to arrest Fluker for public indecency when Officer

12

MacDonald saw him urinating on the wall, the initial search was proper as incident to Fluker's arrest.

Even if the initial search was not proper, under the Fourth Amendment,[6] the inevitable discovery exception to the exclusionary rule "permits the introduction of evidence that eventually would have been located had there been no error, for in that instance 'there is no nexus sufficient to provide a taint.'" *Shultz v. State,* 742 N.E.2d 961, 965 (Ind. Ct. App. 2001) (quoting *Banks v. State,* 681 N.E.2d 235, 239 (Ind. Ct. App. 1997) (quoting *Nix v. Williams,* 467 U.S. 431, 438 (1984))), *trans. denied.* Here, the papers, which were initially discovered when Officer MacDonald removed them during the patdown search, were returned to Fluker and later seized by Officer Holmes when Fluker was taken to the Detective's Bureau for questioning after the car was determined to be stolen and Mendez's body had been discovered. Therefore, at the time the papers were actually seized, the police possessed probable cause to arrest Fluker for a variety of criminal offenses. The evidence was properly seized, and the trial court did not abuse its discretion in admitting the evidence at trial.

Affirmed.

NAJAM, J., and MAY, J., concur.

---

[6] The inevitable discovery exception has not been adopted as a matter of Indiana constitutional law. *Ammons v. State*, 770 N.E.2d 927, 935 (Ind. Ct. App. 2002) (citing *Shultz v. State,* 742 N.E.2d 961, 966 n.1 (Ind. Ct. App. 2001), *trans. denied*), *trans. denied.* The Indiana Supreme Court has previously held that "our state constitution mandates that the evidence found as a result of [an unconstitutional] search be suppressed." *Id.* However, as Fluker has waived any argument under the Indiana Constitution, the inevitable discovery exception is applicable under our Fourth Amendment analysis.