## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 09 2019, 9:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Holly L. Lyons
Brand & Morelock
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ryan Michael Dudley, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 9, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-2482 <br><br> Appeal from the Hancock Circuit Court <br><br> The Honorable R. Scott Sirk, Judge <br><br> Trial Court Cause No. <br> 30C01-1703-F4-620 |

**Barteau, Senior Judge.**

# Statement of the Case

Ryan Michael Dudley appeals from his convictions after a jury trial of two counts of child molesting,[1] each as a Level 4 felony, and one count of child molesting,[2] as a Level 3 felony, and his sentence for those convictions. Finding no double jeopardy violation, no error in the admission of evidence, or inappropriateness of his sentence, we affirm.

# Issues

Dudley presents the following issues for our review, which we restate as the following questions:

I. Do Dudley's two convictions for Level 4 felony child molesting violate the Double Jeopardy Clause of the Indiana Constitution?

II. Did the trial court abuse its discretion by allowing testimony about Dudley's prior admission that he was a sex addict?

III. Is Dudley's sentence inappropriate in light of the nature of the offense and the character of the offender?

---

[1] Ind. Code § 35-42-4-3(b) (2015).

[2] Ind. Code § 35-42-4-3(a) (2015).

# Facts and Procedural History

[3] In 2011, sisters M.G. and B.G.'s parents divorced and the parents shared joint custody of the girls. Their mother exercised parenting time on Mondays and Tuesdays and their father exercised parenting time every Wednesday and Thursday. The parents alternated parenting time on Fridays, Saturdays, and Sundays.

[4] In August of 2016, their father broke up with his girlfriend. In September of 2016, Dudley, a friend of the girls' father, moved in to help pay the rent. Dudley sometimes babysat the girls when their father was at work.

[5] At all relevant times pertaining to the charged offenses, M.G. and B.G. were six and seven years old respectively. After Dudley moved in, he licked B.G.'s vagina multiple times. Dudley also molested M.G. multiple times in various ways.

[6] In March of 2017, the girls spent one week of their spring break with their father. They returned to their mother's house on Sunday, March 19, 2017 for the second week of their spring break. The mother testified that "[a]t family dinner my step-son had made an offhand comment and my daughter B.G. then started to cry and get very upset and worried at the dinner table and we knew something was wrong." Tr. Vol. 2, p. 137. The girls told their mother and stepfather what Dudley had done to them.

[7] The mother called the girls' father and informed him about what the girls had disclosed. She stated that he needed to ask his roommate to leave his house.

The girls' stepfather went to the father's house that night at around 10:00 p.m. He called the father to inform him that he was coming and asked him if he had called the police yet. The girls' father then called law enforcement. Officers arrived shortly thereafter. One of those officers was Detective Randy Ratliff of the Greenfield Police Department.

[8] The girls' stepfather spoke with the officers and told them what the girls had disclosed. He then left at around midnight and returned home. Later, the girls' father came to the girls' mother's house and the three adults discussed how to address what they had learned and what to do going forward.

[9] The girls' mother and stepfather took them to give statements at the Greenfield Police Department, to see Bridget Harter ("Harter") for their forensic interviews, and to see Lori Wilson ("Wilson") for physical examinations.

[10] Although Harter was currently employed through the Indiana Department of Child Services, covering the child abuse hotline at the time of trial, in March of 2017, she worked in Hancock County with the Department of Child Services as an assessment worker. She later testified that it was her responsibility to speak with the victim, the perpetrator, and all of the parties involved to determine whether the child has been a victim of abuse or neglect.

[11] After receiving a call that M.G. and B.G. were the victims of sexual abuse, she called law enforcement, the prosecutor's office, and made arrangements with the girls' mother for forensic interviews. A forensic interview of a victim is conducted by the assessment worker while someone from the prosecutor's

office and from law enforcement listen and observe from a separate room. They assist the assessment worker by providing additional questions to ask or strategies to obtain information. The goal is to maximize the amount of information gathered at the interview such that additional interviews are not necessary. In this situation, on March 21, 2017, Harter interviewed B.G., M.G., the girls' mother, and the girls' father. The girls' stepbrother, J.G., was interviewed a few days later.

[12] On March 21, 2017, M.G. and B.G. were examined by Wilson, a sexual assault nurse examiner employed by Community Hospital in Anderson. She examined the girls and compiled a patient history, which included a detailed recitation of the disclosures made to her by the girls regarding sexual abuse allegations against Dudley. Releases were signed by the girls' mother and the reports were shared with Detective Ratliff, the prosecutor's office, and the Hancock County DCS.

[13] Wilson testified as follows about the girls' disclosures:

> Um [M.G.] told me that um every time she goes to her Dad's house that–that [Dudley]'s there and something happens every time she's at–at her Dad's house with [Dudley].
>
> * * * *
>
> MG [sic] states [Dudley] pulls down her pants and panties and touches his boy part to her girl part. He touched her inside her clothing with his hand and on the outside as well. She states he has put his boy part in her mouth and she demonstrates [Dudley] holding his penis and moving his hand back and forth. She also describes ejaculating and states white stuff comes out in his hand

and he wipes it off with a dirty sock he keeps next to the bed in the dresser. MG [sic] states he's made her touch his boy part with her hand and made her move her hand back and forth. . . . [H]e has tried to put his boy part in her girl part. She points to both her vaginal and anal area. I asked her how that felt and she stated it hurt and [she] asked him to stop but sometimes he doesn't. She also describes getting on her hands and knees and [Dudley] getting behind her and touches his boy part to her um butt.

Tr. Vol. 3, pp. 125-26. Dudley forced B.G. to watch him molest M.G., and B.G. verified that M.G.'s molestations occurred.

[14] B.G. told her mother and her stepbrother what Dudley did to her. When Harter interviewed her, she was extremely quiet and would not disclose to Harter what Dudley had done to her. She testified at trial that she was afraid to tell Harter the truth about what had happened. Later, in February 2018, B.G., who had been seeing a counselor and talking more with her mother about the abuse, went to the Greenfield Police Department to give a second statement.[3]

[15] On March 24, 2017, the State charged Dudley with Count I, child molesting, a Level 4 felony (against M.G.); and Count II, child molesting, a Level 4 felony (against M.G.). On August 19, 2018, the State amended the charging information to include Count III, child molesting, a Level 3 felony (against B.G.). At the conclusion of Dudley's jury trial, which was held on August 21

---

[3] Dudley does not present a challenge to his conviction for Count III, child molesting as a Level 3 felony against B.G.

through August 23, 2018, the jury found Dudley guilty as charged. On September 20, 2018, the trial court sentenced Dudley to consecutive terms of twelve years executed in the Department of Correction on Count I, twelve years executed on Count II, and sixteen years executed on Count III, for an aggregate sentence of forty years. Dudley now appeals.

# Discussion and Decision

## I. Double Jeopardy Violation

Dudley argues that his convictions of the charges under both Count I and Count II violate the protections afforded under Indiana's double jeopardy clause.[4] He claims that, "[t]he way the case was charged and the manner of presentation of the evidence create both a double jeopardy issue and an issue [of] whether the state in fact proved their case beyond a reasonable doubt." Appellant's Br. p. 5. Article 1, section 14 provides in part: "No person shall be put in jeopardy twice for the same offense."

> Questions arising under the Indiana Constitution are to be resolved by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. In construing the Constitution, a court should look to the history of the times and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. Because the intent of the framers of the Constitution

---

[4] Dudley does not make a separate argument under the federal double jeopardy clause.

is paramount in determining the meaning of a provision, this Court will consider the purpose which induced the adoption, in order that we may ascertain what the particular constitutional provision was designed to prevent.

*Richardson v. State*, 717 N.E.2d 32, 38 (Ind. 1999) (internal quotations and citations omitted).

[17] After analyzing prior cases addressing Indiana's constitutional prohibition against double jeopardy, our supreme court articulated the following analysis. "Synthesizing these considerations, we therefore conclude and hold that two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.* at 49. We review de novo whether a defendant's convictions violate either part of the analysis under this provision. *Goldsberry v. State*, 821 N.E.2d 447, 458 (Ind. Ct. App. 2005).

[18] Dudley challenges both elements of the Indiana Constitution's double jeopardy analysis. More specifically, he argues that the jury relied on the same facts to convict him of both counts because they each refer to an offense occurring on March 19, 2017. The language of the charge under Count I is as follows:

> The undersigned, being duly sworn upon oath, says that *on or about March 19, 2017* in Hancock County, State of Indiana, Ryan Dudley did perform or submit to fondling or touching with M.G., a child under the age of fourteen years, to-wit: 7, with the intent to arouse or satisfy the sexual desires of the child or

defendant contrary to the form of the statutes in such cases made and provided by I.C. § 35-42-4-3(b) and against the peace and dignity of the State of Indiana.

Appellant's App. Vol. 2, p. 21 (emphasis added).

[19] The language of the charge under Count II is as follows:

> The undersigned, being duly sworn upon oath, says that *between October 1, 2016 and March 19, 2017* in Hancock County, State of Indiana, Ryan Dudley did perform or submit to fondling or touching with M.G., a child under the age of fourteen years, to-wit:  7, with the intent to arouse or satisfy the sexual desires of the child or defendant contrary to the form of the statutes in such cases made and provided by I.C. § 35-42-4-3(b) and against the peace and dignity of the State of Indiana.

*Id.* (emphasis added).

[20] The statutory elements of the crimes alleged in Count I and Count II are the same.  Therefore, we turn to the actual evidence used in this case.

[21] "Under the 'actual evidence' test, we must examine the evidence presented at trial to determine 'whether each challenged offense was established by separate and distinct facts.'"  *Goldsberry*, 821 N.E.2d at 459.  "To demonstrate two offenses are the same, the appellant must show a reasonable possibility that the facts used by the jury to establish the essential elements of one offense were also used to establish the essential elements of the second offense."  *Id.*  "The appellant must show more than a remote or speculative possibility that the same facts were used."  *Id.*  "To determine what facts were used, we consider

the evidence, charging information, final jury instructions, and arguments of counsel." *Id.*

[22] The evidence shows that Wilson conducted a sexual assault examination which included a patient history for M.G. and B.G. As respects M.G., Wilson learned that M.G., who was six years old at the time of the crimes, described being touched inappropriately by Dudley in the chest area, the vaginal area, and the anal area.

[23] M.G. told Wilson that this happened every time they visited their father's house and Dudley was there. The touching would take place on the floor in his bedroom, in the living room, and in the garage. Although others might be present in the home at the time, Dudley would sexually abuse M.G. in a room where no one could see what was happening.

[24] She disclosed that Dudley touched her "girl parts" both inside and outside of her clothing. Tr. Vol. 3, p. 126. He pulled down her pants and panties and touched "his boy part to her girl part." *Id.* Six-year-old M.G. also described ejaculation and demonstrated how Dudley held his penis moving his hand back and forth. She further stated that white stuff came out in his hand, and he wiped it off with a dirty sock he kept next to the bed in the dresser. She told Wilson that he "has put his boy part in [my] mouth," but does not allege that he ejaculated in her mouth. *Id.* She also stated that Dudley placed her hand on his penis "and made her move her hand back and forth." *Id.*

She disclosed that Dudley tries "to put his boy part in her girl part," pointing to her vaginal and anal area. *Id.* When asked how that felt, "she stated it hurt and [she] asked him to stop but sometimes he doesn't." *Id.* She further described "getting on her hands and knees and [Dudley] getting behind her" touching "his boy part to her um butt." *Id.* M.G. stated that Dudley "sometimes [] makes B.G. stay" during M.G.'s abuse, and other times "he has me leave and B.G. has to stay in the room with him." *Id.*

At trial, M.G. testified that Dudley inappropriately touched her more than ten times.

Detective Ratliff's probable cause affidavit included the following allegation:

> 6. [Stepfather] and [Mother] then spoke with [M.G.]. [Stepfather] said the [sic] [M.G.] told them that Dudley had done things that he said were of a sexual nature on several occasions including this past Sunday (3/19/17).

Appellant's App. Vol. 2, p. 23. The probable cause affidavit further stated:

> 8. [Father] had worked most of the day on 3/19 and the girls were at home with his girlfriend [] and [Dudley.]
>
> 9. I spoke with [] Dudley who said that that [sic] he was moving out and that he had moved in approx, [sic] October 2016. Dudley also provided contact information.
>
> 10. [Father's girlfriend] advised that she and the girls had left about 10:00 am, were at Starbucks about 11:00 am and took a drink to [Father] at work. They then went to eat at the Gas Grille (SR 109 & 1-70). She had a photo of the girls taken shortly after noon, showing that they were still eating, and likely returned home about 12:30 pm. After that the girls played both

outside and inside till about 5:00 pm when they went to Walmart. [Father's girlfriend] said that [Father] took them to their mother's after that.

*Id.* at 24.

[28] At trial, Detective Ratliff testified in pertinent part as follows:

> Beyond the initial report uh something occurring on March 19[th] the Sunday of March 19th when the children last had visitation with their Father, the timeline was very broad from the time Mr. Dudley moved in until the time Mr. Dudley moved out.
>
> * * * *
>
> I asked [Dudley] if he could explain [why the girls had seen his privates] and he said the only thing that he could [think] of was that that morning that Sunday morning he was out in the garage smoking and he had ripped his pants and thought maybe MG had seen something.

Tr. Vol. 3, pp. 75-78. He further testified that he assembled all of the information he had gathered to draft the probable cause affidavit. *Id.* at 78.

[29] Therefore, the evidence reveals that the sexual abuse occurred between October of 2016 and March 19, 2017. There are references to the abuse occurring in different rooms and in different ways. M.G. stated that sometimes Dudley would not stop his attempts at vaginal and anal penetration and that it hurt. "Sometimes" indicate multiple incidents of abuse. Indeed, she testified that the abuse occurred on more than ten occasions. Further, Detective Ratliff's probable cause affidavit and testimony refer to something happening on Sunday March 19, 2017. The young girls disclosed what had happened to their

similarly-aged stepbrother. The stepbrother then made a remark including a sexual reference which upset B.G. at the family dinner table after the girls had returned to their Mother's house on Sunday March 19, 2017. On that evening, both girls disclosed to their Mother and Stepfather what Dudley had done to them.

[30] We conclude under the actual evidence test that, given the numerous incidents of sexual abuse over time, there is not a reasonable possibility the same facts were used by the jury to establish the essential elements of both Count I and Count II, that there was sufficient evidence to support both convictions, and that the Indiana Constitution's double jeopardy protections were not violated.

## II. Admission of Evidence

[31] Dudley contends that the trial court abused its discretion by allowing evidence "through state's witness Mark Stacy of a statement made by [Dudley] nine years prior to the trial that he was a sex addict . . . offered for the sole purpose of inflaming the jury." Appellant's Br. p. 6.

[32] Our standard of review in this area is well-settled. The admission of evidence falls within the sound discretion of the trial court, and we review the trial court's decision for an abuse of that discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Morrison v. State*, 824 N.E.2d 734, 739 (Ind. Ct. App. 2005), *trans. denied*. However, if a trial court abuses its discretion by admitting

challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected. *McVey v. State*, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007) (internal quotations omitted), *trans. denied*. "In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury." *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). "Moreover, we will sustain the trial court['s] [decisions on the admission of certain evidence] if it can be done on any legal ground apparent in the record." *Jester v. State*, 724 N.E.2d 236, 240 (Ind. 2000). Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence properly admitted. *Id.*

[33] Dudley claims that the trial court abused its discretion by admitting the evidence because it violated Indiana Rules of Evidence 403 and 404(b). The pertinent rules provide as follows:

> Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, or Other Reasons
>
> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.
>
> Rule 401. Test for Relevant Evidence
>
> Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Rule 404. Character Evidence; Crimes or Other Acts

\* \* \* \*

(b) Crimes, Wrongs, or Other Acts.

(1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses; Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

[34] At trial, Stacy testified as follows after being sworn in and spelling his name for the court reporter:

> Q: And um Mr. Stacy back in 2009 did you come into contact with the defendant uh Ryan Dudley?
>
> A: Yes I did.
>
> Q: And at that time uh did the defendant tell you anything out of the ordinary?
>
> A: Yes he did.
>
> Q: And what statement did he make to you?
>
> A: He told me he was a sex addict and he was in treatment for that.

Tr. Vol. 3, pp. 39-40. No cross-examination was conducted. Stacy's name was mentioned briefly during the State's closing argument connecting Stacy's testimony to support the inference that the defendant committed those crimes for his own sexual arousal. "[T]he defendant did this for his own sexual arousal, that's what the [sic] Mark Stacy came in and testified about, he's a sex addict. That was a self-admission that he made back in 2009." *Id.* at 156.

[35]　Indiana Evidence Rule 404(b) is designed to prevent the jury from assessing a defendant's guilt of the instant offense based on past propensities. *Collins*, 966 N.E.2d at 104. Put a different way, Evidence Rule 404(b) excludes evidence offered for the sole purpose of raising the forbidden inference of demonstrating a defendant's propensity to commit the charged crime. *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*. The standard used for assessment of admissibility of 404(b) evidence is: (1) whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) whether the probative value of the evidence is outweighed by its unfair prejudice pursuant to Evidence Rule 403. *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997). As for relevance, the trial court may consider any factor it would ordinarily consider under Evidence Rule 402, including the evidence's ability to tie the charged acts to the defendant. *Id.*

[36]　Dudley's admission that he is a sex addict who was seeking treatment for that addiction is not a prior bad act or bad character evidence. "[E]vidence which creates a mere inference of prior bad conduct does not fall within the purview of Evidence Rule 404(b)." *Dixson v. State*, 865 N.E.2d 704, 712 (Ind. Ct. App.

2007), *trans. denied*. Dudley's admission that he was a sex addict is not necessarily indicative of criminal behavior. Indeed, for purposes of this analysis, it merely establishes that he was seeking treatment, i.e., was bad for some unspecified reason. This evidence does not qualify as a prohibited bad act or bad character such that it should be excluded under Evidence Rule 404(b).

[37] We next address Dudley's claim that the evidence is unduly prejudicial and inadmissible under Evidence Rule 403. "The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission, and its ruling will be reviewed only for an abuse of discretion." *Crain v. State*, 736 N.E.2d 1223, 1235 (Ind. 2000). "All evidence that is relevant to a criminal prosecution is inherently prejudicial, and thus the Evidence Rule 403 inquiry boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012). "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." *Id.*

[38] In sum, Stacy's testimony simply consisted of his statement that he had a conversation with Dudley in 2009 in which Dudley admitted that he was a sex addict who was receiving treatment for his addiction. Further, the State's concise reference to Stacy's testimony in its closing argument revealed the purpose for introduction of that testimony–to establish Dudley's motive and the intent element of the charged offenses.

[39] Evidence Rule 401 further supports the admission of Stacy's testimony. The evidence's probative value was to show that Dudley touched M.G. and B.G. with the intent to arouse or satisfy the sexual desires of the victims, who were very young children, or Dudley, a thirty-one-year old adult. "Mere touching alone is insufficient to constitute the crime of child molesting." *Carter v. State*, 31 N.E.3d 17, 30 (Ind. Ct. App. 2015), *trans. denied*. "The State must also prove beyond a reasonable doubt that the act of touching was accompanied by the specific intent to arouse or satisfy sexual desires." *Id.* "The intent element of child molesting may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and unusual consequence to which such conduct usually points." *Id.*

[40] The implication derived from Stacy's testimony about Dudley's admission is that Dudley has difficulty controlling his sexual urges and that his admission makes it more probable that his intent in touching B.G. and M.G. was to arouse or satisfy his own sexual desires. We conclude that Stacy's testimony was relevant.

[41] Assuming, arguendo, that the admission of Stacy's testimony was erroneous, such error was harmless in light of other evidence presented at trial. There was substantial independent evidence of Dudley's guilt. Each of the girls testified that Dudley inappropriately touched them to arouse or satisfy his own sexual desires. The disclosures made by the girls to their Mother, Stepfather, and Wilson remained consistent. "The evidentiary error is harmless if we are satisfied that the conviction is supported by such substantial independent

evidence of guilt that there is little likelihood the challenged evidence contributed to the conviction." *Townsend v. State*, 33 N.E.3d 367, 372 (Ind. Ct. App. 2015), *trans. denied*.

[42] Here, M.G. and B.G. disclosed to others that Dudley had touched them inappropriately. B.G. testified at trial that Dudley "had licked my vagina" and that it had occurred more than once in Dudley's room. Tr. Vol. 2, p. 240. M.G. disclosed in detail that Dudley had sexually abused her and at one point demonstrated the methods used in the instances of abuse. Dudley forced B.G. to watch him molest M.G., and B.G. verified that M.G.'s molestations occurred. The trial court correctly decided that the minimal prejudice to Dudley from the admission of Stacy's testimony was outweighed by independent evidence of Dudley's guilt. We conclude that there is no reversible error here.

## III. Inappropriate Sentence

[43] Dudley challenges his sentence, claiming that his sentence is inappropriate in light of the nature of the offense and the character of the offender. More specifically, he argues that his aggregate sentence of forty years "was too lengthy given that [] [he] had one prior felony and one misdemeanor conviction, that this was not a situation [where] either victim was injured as a result of [Dudley's] conduct and where the charges were both enhanced and run consecutively." Appellant's Br. p. 6.

[44] "Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution 'authorize[] independent appellate review and revision of a sentence imposed by the trial court.'" *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006) (emphasis omitted) (quoting *Buchanan v. State*, 767 N.E.2d 967, 972 (Ind. 2002))), *clarified on reh'g*, 875 N.E.2d 218 (2007). "This appellate authority is implemented through Appellate Rule 7(B), which provides that the Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Anglemyer*, 868 N.E.2d at 491 (internal citations omitted). "Of course a defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review." *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[45] Under Appellate Rule 7(B), the question is "not whether another sentence is more appropriate" but rather "whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Whether a sentence should be deemed inappropriate turns on the sense of culpability of the defendant, the severity of the crime, the damage done to others, and other factors. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). We may consider whether a portion of the sentence is ordered suspended or is otherwise fashioned using any of the variety of sentencing tools available to the trial judge. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). "[Deference to

trial courts] should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[46] The nature of the offense analyzes the defendant's action in comparison with the elements of the offense. *Cardwell*, 895 N.E.2d at 1224. "The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation." *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017).

[47] Here, regarding the convictions of Level 4 felony child molesting involving M.G., the State was required to prove beyond a reasonable doubt that Dudley with M.G., who was under fourteen years of age, performed or submitted to any fondling or touching of either M.G. or Dudley with intent to arouse or satisfy the sexual desires of either M.G. or Dudley. Ind. Code § 35-42-4-3(b). Regarding the conviction of Level 3 felony child molesting involving B.G., the State was required to prove beyond a reasonable doubt that Dudley with B.G., who was under fourteen years of age, knowingly or intentionally performed or submitted to sexual intercourse or other sexual conduct (including the mouth of one person with the sex organ of the other). Ind. Code § 35-42-4-3(a).

[48] Dudley forced two very young girls aged 6 and 7 to submit to multiple molestations over a period of six months. Not only did Dudley molest B.G., he

forced her to watch him molest M.G. He told the girls not to disclose the sexual abuse to anyone. Dudley was in a position of trust with the family as he was a close friend of the girls' father and sometimes babysat the girls. M.G. disclosed that some of the times that he molested her, her father was in the house. He had multiple opportunities to cease his criminal conduct but chose to persist until the girls disclosed the molestations. In addition, on several occasions M.G. told Dudley he was hurting her, but he continued his molestations.

[49] As for the character of the offender, we refer to "general sentencing considerations and the relevant aggravating and mitigating circumstances." *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). A defendant's criminal history is relevant to review of his character. *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017), *trans. denied*.

[50] Dudley gave a statement for purposes of the preparation of a pre-sentence investigation report. To summarize, Dudley refused to accept responsibility for his actions, choosing instead to blame others. He claimed that a bad jury was selected to decide his case. He also blamed others for trying to set him up by encouraging M.G. and B.G. to lie about the allegations against him. Further, he claimed that one of the State's witnesses' testimony rambled so much that a juror fell asleep during that testimony. The take away from the evidence of his failure to accept responsibility for his actions and his decision to blame others is that he fails to demonstrate remorse.

[51] "A record of arrest, without more, does not establish the historical fact that a defendant committed a criminal offense and may not be properly considered as evidence of criminal history." *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005). Nonetheless, a record of arrests and charges may reveal that a defendant has not been deterred from criminal activity even after having been subject to the police authority of the State. *Id.* A sentencing court may consider the charges as evidence of the defendant's character and the risk that he will reoffend. *Tunstill v. State*, 568 N.E.2d 539, 545 (Ind. 1991).

[52] The record reflects that Dudley has been charged with impregnating a thirteen-year-old girl, having sexual intercourse with another thirteen-year-old girl, and having been reported as engaging in "other sexual conduct" as defined by Indiana Code section 35-31.5-2-221.5 (2014), with another thirteen-year-old girl. In 2003, a police report was made alleging that Dudley committed a sexual assault on his cousin. That same cousin was the subject of a police report in 2009 that was prosecuted, alleging that Dudley engaged in "other sexual conduct." Due to the intervention of certain of Dudley's family members, the charge to which he pleaded was battery as a Class D felony.

[53] Although Dudley has but one felony conviction and one misdemeanor conviction, his record of reports, arrests, and charges reflect that, despite numerous contacts with the legal system, Dudley has failed to modify his behavior. This reflects poorly on his character.

The sentencing range for a Level 4 felony is imprisonment for a fixed term of between two and twelve years with the advisory sentence being six years. Ind. Code § 35-5-2-5.5 (2014). The sentencing range for a Level 3 felony is imprisonment for a fixed term of between three and sixteen years with the advisory sentence being nine years. Ind. Code § 35-50-2-5 (Ind. 2014). After finding the aggravating factors of Dudley's history of criminal delinquent behavior and his position of care and trust with the victims, the trial court sentenced Dudley to an aggregate term of forty years executed.

Dudley has not met his burden of persuading this court that his sentence is inappropriate in light of the nature of the offense or the character of the offender.

Affirmed.

## Conclusion

In light of the foregoing, we conclude that there was no violation of the protections offered under the double jeopardy clause of the Indiana Constitution, that the trial court did not abuse its discretion in the admission of evidence, and that Dudley's sentence is not inappropriate in light of the nature of the offense and the character of the offender.

Najam, J., and Kirsch, J., concur.